# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Case No.: |
| MONSANTO COMPANY and DELTA AND PINE LAND COMPANY, | |
| Defendants. | Filed: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

Defendants entered into an Agreement and Plan of Merger dated August 14, 2006, pursuant to which Monsanto Company ("Monsanto") will acquire Delta and Pine Land Company ("DPL").  The United States filed a civil antitrust Complaint on May 31, 2007, seeking to enjoin the proposed acquisition.  The Complaint alleges that the likely effect of this acquisition would be to substantially lessen competition in the market for the development, production, and sale of traited cottonseed – cottonseed genetically modified to contain desirable characteristics from non-cottonseed sources – in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  This loss of competition would likely result in higher prices and fewer choices for cotton farmers in the

MidSouth (Mississippi, Arkansas, Louisiana, Missouri, and Tennessee) and Southeast (Alabama, Georgia, Florida, North Carolina, South Carolina, and Virginia).

At the same time the Complaint was filed, the United States also filed a Hold Separate and Preservation of Assets Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition.  Under the proposed Final Judgment, which is explained more fully below, (1) Defendants must divest Stoneville Pedigreed Seed Company ("Stoneville"), certain cottonseed lines developed by DPL for the MidSouth and Southeast, and additional cotton breeding assets of Monsanto (collectively, the "Enhanced Stoneville Assets") to an acquirer or acquirers acceptable to the United States; (2) Defendants must divest to Syngenta Crop Protection AG ("Syngenta") forty-three DPL cottonseed lines containing VipCot, Syngenta's insect-resistant trait technology that DPL was developing for cottonseed (the "VipCot Assets"); and (3) Defendant Monsanto must modify its cottonseed trait licenses with seed companies to permit licensees to breed and sell, without penalty, cottonseed containing non-Monsanto traits and cottonseed containing both licensed Monsanto traits and non-Monsanto traits, and modify its Cotton States licenses to remove any provision that allows Monsanto to terminate the license if the licensee sells cottonseed containing other traits.

Until the divestiture of the Enhanced Stoneville Assets has been accomplished, the Hold Separate requires Defendants to take all steps necessary to ensure that DPL is operated as an independent, ongoing, economically viable competitive business held entirely separate, distinct and apart from Monsanto's commercial operations.  The proposed Final Judgment provides that if the Enhanced Stoneville Assets are not sold within the time period prescribed in the proposed Final Judgment to an acquirer or acquirers acceptable to the United States, Monsanto will divest

DPL.

The Hold Separate also requires Defendants to preserve the divestiture assets. Until the divestiture of the Enhanced Stoneville Assets, Defendants must take all steps necessary to ensure that Stoneville will be maintained and operated as an ongoing, economically viable and active competitor in the development, production, and sale of traited cottonseed. Until the divestiture of the VipCot Assets has been accomplished, Defendants must preserve the VipCot Assets and use all reasonable efforts to proceed with their development, including maintaining all production processes for the assets, so as not to unduly delay the commercialization and sale of cottonseed containing VipCot in the United States.

The settlement ensures the continuation of current competition in the MidSouth and Southeast between Stoneville and DPL. It also preserves Syngenta's ability to bring cottonseed with VipCot to the market with minimal delay. And, it provides trait developers a seed company independent of Monsanto offering a platform of high-quality germplasm for the development of non-Monsanto traited cottonseed for the MidSouth and Southeast, preserving the prospects for trait competition in cottonseed.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    *The Defendants and the Proposed Transaction*

Defendant Monsanto is a Delaware corporation with its headquarters in St. Louis,

Missouri.  Monsanto is a leading global provider of agricultural products for farmers, including

seeds for cotton, soybeans, and corn; in-the-seed trait technologies that protect crops against

damage from insects and weeds; and crop protection chemicals such as the herbicide Roundup.

Monsanto's total revenues in 2006 exceeded $7.3 billion.  The vast majority of cotton grown in

the U.S. contains biotech traits, and over 96% of the traited cottonseed sold domestically

contains Monsanto traits.  Monsanto's two groups of cottonseed traits are marketed under the

brand names (a) Roundup Ready, and its successor Roundup Ready Flex, both of which make

cotton resistant to harm from glyphosate-based herbicides like Monsanto's Roundup, and  (b)

Bollgard, and its successor Bollgard II, both of which make cotton plants toxic to lepidopteran

insect pests such as the cotton bollworm.  Monsanto licenses its traits to seed companies,

including DPL.

Monsanto's cottonseed sales, primarily through its Stoneville subsidiary, account for

approximately 16% of the traited cottonseed sold in the United States in 2006, making Monsanto

one of the largest sellers of traited cottonseed in the United States.  In the MidSouth and

Southeast, Monsanto accounted for 17% and 8%, respectively, of all traited cottonseed sales.

Defendant DPL is a Delaware corporation with its headquarters in Scott, Mississippi.

DPL is the largest supplier of traited cottonseed in the United States.  In 2006, DPL accounted

for approximately 56% of the traited cottonseed sold in the United States, with sales exceeding

$417 million.  In the MidSouth and Southeast, DPL accounted for 79% and 87%, respectively, of

all traited cottonseed sales.  DPL does not itself produce traits, but works with biotechnology

companies to develop cottonseed traits and to breed the resulting traits into DPL germplasm (the

genetic material containing the inherent qualities of cottonseed, such as yield and fiber quality).

The combination of Monsanto and DPL would create the largest provider of traited

4

cottonseed in the United States and give the combined firm about 95% of traited cottonseed sales in the MidSouth and Southeast.  The proposed transaction would also eliminate DPL as a partner independent of Monsanto for competing trait developers, thereby substantially delaying or preventing the development and introduction of cottonseed containing non-Monsanto traits. Thus, the proposed transaction would lessen competition substantially in violation of Section 7 of the Clayton Act.

**B.**    ***The Cotton Industry***

Cotton is currently grown on over fifteen million acres in the United States, in seventeen states across the Southern United States from Virginia to California.  The industry recognizes four distinct growing regions: the MidSouth, Southeast, Southwest (Texas, Kansas, and Oklahoma), and West (Arizona, New Mexico, and California).  The cottonseed varieties grown vary by region because growing conditions, such as soil type and climate, affect seed performance.  Farmers choose cottonseed varieties that perform best in their geographic area, placing the greatest emphasis on a variety's yield (*i.e.*, the expected amount of cotton produced per acre).

Cottonseed companies continually work on developing improved cottonseed varieties through their breeding programs.  Cotton breeding is a costly and time-consuming process in which the cottonseed company selects lines to breed together (or "cross"), plants cottonseed generated by that initial cross, and then selects the best plants for further crossing to create a variety with the desired characteristics.  In most cases, it takes eight to ten years from the initial cross until a new conventional cottonseed variety (*i.e.*, seed containing no transgenic traits) is ready for market, while a traited version of that same conventional variety may take an additional two to three years.

The success of a cottonseed company's breeding program is dependent on many factors, the most important of which are the quantity and quality of available breeding materials, *i.e.*, germplasm. A company with a large collection of high-quality, or elite, germplasm has a significant advantage because it is able to identify the best genetic material and use it in a wide variety of possible crossing combinations, resulting in a greater likelihood of developing a successful variety.

      1.    <u>The Development of Traited Cottonseed</u>

Monsanto and DPL partnered in the 1980s to develop and produce traited cottonseed. DPL contributed its high-quality germplasm and experienced cotton breeders; Monsanto, its insect-resistant and herbicide-tolerant traits. In 1996, DPL began to sell the first cottonseed with Monsanto's insect-resistant trait (Bollgard) and, the following year, introduced a variety with Monsanto's herbicide-tolerant trait (Roundup Ready).

Farmers quickly adopted Monsanto-traited cottonseed because its use significantly lowered farming costs and reduced the risk of crop loss. Farming with conventional seed involved labor-intensive, costly herbicide and insecticide applications at specific times in the growing season. Farmers had to target herbicide applications only on weeds to avoid killing the cotton plants. By planting cottonseed containing an herbicide-tolerant trait, such as Roundup Ready, farmers can spray herbicide over the entire crop to kill weeds without killing the young cotton plants. Cottonseed containing an insect-resistant trait, such as Bollgard, reduces insecticide purchases and spraying. Today, almost all of the cottonseed planted in the MidSouth and Southeast, where insects and weeds pose significant problems, contains traits that provide both insect resistance and herbicide tolerance.

When farmers acquire traited cottonseed, they pay a price per bag to the seed distributor,

who, in turn, pays the seed manufacturer (*e.g.*, DPL) for the seed and a separate license fee to the developer of the trait (*e.g.*, Monsanto). This license fee, commonly referred to as the "technology fee," is usually collected by the seed distributor for the trait developer. Typically, the trait developer shares a portion of the technology fee with the seed distributor and the seed manufacturer. The technology fee can constitute as much as 80% of farmers' total costs for a bag of traited cottonseed.

Only two non-Monsanto cotton traits are currently commercialized. WideStrike is an insect-resistant trait developed by Dow AgroSciences to compete with Monsanto's Bollgard trait. WideStrike is only available in Dow's Phytogen cottonseeds, which are primarily used in California where they perform well. LibertyLink, a trait developed by Bayer CropScience to make cotton tolerant to glufosinate herbicides, competes with Monsanto's Roundup Ready glyphosate herbicide-tolerant trait. LibertyLink is only available in Bayer's FiberMax cottonseeds, which are primarily used in the Southwest where they perform well. Together, cottonseed containing WideStrike or LibertyLink accounted for less than 5% of total United States traited cottonseed sales in 2006.

2.    DPL's Trait Development with Monsanto's Competitors

After a failed attempt to merge with Monsanto in the late 1990s, DPL commenced a strategy to replace (or "trade-out") the Monsanto traits in DPL cottonseed with traits developed by Monsanto's competitors. DPL has worked with several biotechnology companies, including Syngenta, DuPont, Bayer, and Dow, to develop cottonseed containing the traits developed by these companies that would compete with cottonseed containing Monsanto traits.

The process to develop a cotton trait and breed and commercialize cottonseed varieties with that trait typically takes eight to twelve years and costs over $100 million. The process often

requires thousands of attempts before developing a traited cottonseed that can be used to breed commercial varieties.  In addition, extensive regulatory approvals, both in the United States and abroad, are required.

Trait developers consider DPL an attractive partner for two reasons.  First, DPL is in a strong position to introduce new trait technologies due to its extensive breeding programs, elite germplasm collection, technical service capabilities, know-how, brand recognition, and market position.  Second, DPL's trait licenses with Monsanto allow DPL to offer competing trait developers the ability to combine or "stack" their traits in DPL cottonseed with Monsanto traits.  This stacking right would allow, for example, the developer of an insect-resistant trait to bring that trait to market in cottonseed that also contains Monsanto's Roundup Ready (or Roundup Ready Flex) herbicide-tolerant  trait.  Most United States farmers choose cottonseed that contains both an insect-resistant trait and an herbicide-tolerant trait.  Monsanto's trait licenses with cottonseed companies other than DPL severely restrict the ability of those companies to work with other trait developers, with some licenses prohibiting stacking of Monsanto's traits with another company's traits.

DPL's most advanced work with non-Monsanto trait developers is with Syngenta.  DPL's developmental work with Syngenta resulted in a 2004 agreement to commercialize cottonseed with Syngenta's VipCot insect-resistant traits.  VipCot has been incorporated into some of DPL's best germplasm, and DPL had expected, before Monsanto's proposed acquisition was announced, to begin marketing such cottonseed as early as 2009.

      3.    <u>Monsanto's Cottonseed Business</u>

Facing DPL's strategy to replace Monsanto traits in DPL seed with traits developed by Monsanto's competitors, Monsanto set about building its own cottonseed business to compete

vigorously against DPL.  Pursuant to this strategy, Monsanto began its Cotton States program in early 2002.  Through Cotton States, Monsanto obtains licenses for cotton germplasm that small seed companies, private breeders and universities have developed; improves the germplasm through selective breeding; introduces Monsanto traits; and out-licenses the resulting traited cottonseed varieties to distributors and small cottonseed companies for sale under private labels.

In 2005, Monsanto repurchased Stoneville, the second-largest traited cottonseed company in the MidSouth and Southeast.  (Monsanto had previously purchased Stoneville in 1996, and sold it in 1999 shortly before abandoning its attempt to acquire DPL.)  Upon reacquiring Stoneville, Monsanto immediately invested capital to improve Stoneville's competitive position.  With the acquisition of Stoneville, Monsanto became the second largest seller of traited cottonseed in the important MidSouth and Southeast regions.

Monsanto aggressively worked to strengthen its cottonseed business by, among other things, focusing on advanced breeding techniques and germplasm development and investing in breeding facilities.  Monsanto predicted internally that these investments would enable Monsanto to increase its share of the cottonseed business in competition with DPL.

## C.    *Product and Geographic Markets*

The relevant antitrust product and geographic markets are the development, commercialization, and sale of traited cottonseed for the MidSouth and Southeast.  Growing conditions for cotton differ across regions due to weather conditions, soil type, and varied demands for weed and insect control.  Farmers demand cottonseed varieties that produce high yield for their particular growing conditions.  Monsanto and DPL recognize this demand and market cottonseed varieties by region.

In many regions of the country, particularly the MidSouth and Southeast, farmers demand

9

that cottonseed have traits that provide insect resistance and herbicide tolerance.  In the MidSouth and Southeast, approximately 90% of traited seed purchased by farmers contains both types of traits.  Monsanto prices traits by region.

Cotton is a particularly high-value crop in the MidSouth and Southeast, where over 50% of domestic cotton is grown.  The cost of cottonseed amounts to only a fraction of the total cost of growing cotton.  A small but significant increase in price of traited cottonseed in the MidSouth and Southeast regions would not cause sufficient farmers to plant other crops, or switch sufficient cottonseed purchases to conventional (non-traited) cottonseed or cottonseed varieties not well suited for their regions to make the price increase unprofitable.

**D.      *The Competitive Effects of the Transaction on the Market for the Development, Production, and Sale of Traited Cottonseed in the MidSouth and Southeast***

Monsanto's acquisition of DPL would substantially lessen competition for the development, commercialization, and sale of traited cottonseed in the MidSouth and Southeast. First, the combination would increase the merged firm's ability and incentive to raise prices and reduce choices for traited cottonseed in the MidSouth and Southeast.  In the MidSouth, DPL and Stoneville account for approximately 79% and 16%, respectively, of traited cottonseed sales.  In the Southeast, DPL and Stoneville account for approximately 87% and 8%, respectively, of traited cottonseed sales.  After the proposed acquisition, the combined Monsanto and DPL would have a market share of approximately 95% for traited cottonseed sales in both the MidSouth and Southeast.[1]

---

[1]  The MidSouth and Southeast traited cottonseed markets are highly concentrated.  As measured by the Herfindahl-Hirschman Index ("HHI"), which is commonly used in merger analysis and explained in Appendix A of the Complaint, Monsanto's acquisition of DPL would increase the HHI by 3310 in the MidSouth, resulting in a postmerger HHI of 9110.  In the Southeast, the proposed acquisition would increase the HHI by 1489, resulting in a postmerger

Second, the merger would eliminate DPL as a partner independent of Monsanto for developers of cotton traits that would compete against Monsanto's traits. Syngenta's current efforts to develop and commercialize with DPL cottonseed with Syngenta's VipCot insect-resistant technology to compete with Monsanto's Bollgard traits would be substantially delayed or prevented, preserving Monsanto's current dominance. And, the merger would likely delay, if not deter, efforts to develop other traits that would provide benefits to United States cotton farmers, including herbicide-tolerant traits that would compete with Monsanto's Roundup Ready traits. As a result, farmers likely would have fewer choices of, and face higher prices for, traited cottonseed.

### E.    *Entry*

Entry into the traited cottonseed business would be difficult, time consuming, and expensive. It requires the assets and expertise both to breed high-performing varieties of cottonseed and to develop or obtain traits providing insect resistance and herbicide tolerance. For a company that has developed a trait, *de novo* entry to develop, breed, and commercialize cottonseed varieties with the trait takes approximately twelve years, costs millions of dollars, requires a sufficient supply of high-quality germplasm, and is uncertain. Therefore, entry into the traited cottonseed business would not be timely, likely, or sufficient in its magnitude, character, and scope to deter or counteract an anticompetitive increase in the price of traited cottonseed by a combined Monsanto and DPL.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment remedies the anticompetitive effects of the acquisition alleged in the Complaint – the elimination of competition between DPL and Monsanto for the

---

HHI of 9184.

development, breeding, and sale of traited cottonseed and the elimination of DPL as a partner independent of Monsanto for developers of traits that would compete against Monsanto – by requiring Defendants to divest the Enhanced Stoneville Assets to an approved acquirer, to divest to Syngenta over forty DPL cottonseed breeding lines containing VipCot, and to make certain licensing term modifications to Monsanto's Cotton States and seed company licenses.

Taken together, these provisions will preserve existing competition in the market for traited cottonseed in the MidSouth and Southeast, will allow Syngenta to market cottonseed with VipCot with no more than minimal delay, and will ensure the continued presence of a cottonseed company independent of Monsanto with sufficient germplasm and breeding capabilities to serve as an effective platform for development of cottonseed traits in competition with Monsanto.

The proposed Final Judgment and its accompanying schedules set forth the specific assets to be divested (including certain limitations to the assets being divested), the modifications that Defendant Monsanto must make to its third-party licenses, and the other obligations of Defendants.  The following describes these remedy provisions:

## A.      *The Enhanced Stoneville Assets*

The Enhanced Stoneville Assets consist of Monsanto's Stoneville business, promising Monsanto cottonseed germplasm, and twenty lines of elite DPL germplasm, including a dozen of DPL's most promising developmental lines for the MidSouth and Southeast as well as Delta Pearl, the parent of DPL's highly-popular DPL555 variety.  The proposed Final Judgment requires Defendants to divest the Enhanced Stoneville Assets to an acquirer acceptable to the United States in its sole discretion.  The acquirer must have a credible commitment to the traited cottonseed market and have the intent and capability of competing effectively in the market.  The Defendants must divest the assets in such a way as to satisfy the United States, in its sole discretion, that the

12

assets can and will be used by the acquirer as part of a viable, ongoing business engaged in the development, production, and sale of traited cottonseed. These provisions are designed to ensure that the Enhanced Stoneville Assets will be used to preserve competition that would otherwise be lost as a result of the acquisition.

This divestiture will provide the acquirer of the Enhanced Stoneville Assets the tools it needs – including valuable germplasm from Stoneville, Monsanto and DPL – to be a viable and active competitor in the MidSouth and Southeast, restoring the traited cottonseed competition that would otherwise be lost as a result of the acquisition. The Enhanced Stoneville Assets will provide the acquirer a significant base of current and developmental varieties that would be attractive to trait developers looking to introduce traits into cottonseed, particularly cottonseed well suited to the MidSouth and Southeast. The remedy in the proposed Final Judgment will give the acquirer capabilities that exceed those of Stoneville and a foundation on which to replicate the platform for trait development and commercialization that DPL previously provided.

The Enhanced Stoneville Assets include:

1.    <u>Stoneville</u>

Defendants will divest Monsanto's U.S. Stoneville business, including all U.S. Stoneville cotton germplasm. This divestiture will give the acquirer the benefit of Stoneville's existing presence in the MidSouth and its germplasm development pipeline, which includes approximately 35 mid-to-full- and full-season lines for potential commercialization in the MidSouth and Southeast between 2008 and 2012. The divestiture will also include Stoneville's breeding facilities, tangible assets, brand names, breeder records and other intangible assets.

The proposed Final Judgment also requires Monsanto to grant the acquirer licenses to Monsanto's current Roundup Ready and Bollgard traits on terms at least as favorable as DPL's

current terms with respect to stacking rights, revenue sharing, and options for licensing future traits. This licensing requirement will provide the acquirer of Stoneville the same ability as DPL to offer other trait developers a platform upon which to stack non-Monsanto traits with Monsanto traits.

2.     Additional Monsanto Cotton Germplasm

Divesting Stoneville by itself would not fully restore the lost competition between Monsanto and DPL as it would fail to capture the breadth of Monsanto's cotton breeding program that supported Monsanto's projected share growth. In addition to Monsanto's improvements to Stoneville (which included adding a breeding station and personnel), Monsanto worked on advanced breeding techniques and germplasm development to strengthen its future competitive position. The proposed Final Judgment requires Monsanto to divest the germplasm and technology related to these programs, as described below. As some of this work was undertaken in connection with Monsanto's trait development efforts, the proposed Final Judgment allows Monsanto to retain assets (and research rights to germplasm) that directly relate to trait development.

*Advanced Exotic Yield Lines*: Defendants will divest the exclusive right to commercialize varieties from the Advanced Exotic Yield Lines set forth in Schedule D of the proposed Final Judgment. Monsanto developed this germplasm as part of its ongoing non-transgenic yield trait discovery project, which seeks to discover traits in exotic cotton plants that could be bred into commercial varieties to increase yield. This project has resulted in the creation of promising developmental germplasm lines. Monsanto anticipated that varieties developed from these lines would be well suited for the MidSouth and Southeast and could be introduced as early as 2009. The acquirer will be able to commercialize such varieties and use the lines for additional breeding.

14

As these lines were part of Monsanto's ongoing trait research project, Monsanto will be allowed to obtain a license back from the acquirer to continue to use these lines for that research effort.

*Marker Assisted Breeding ("MAB") Populations*:  Defendants will divest all of the germplasm from Monsanto's MAB program, as listed in Schedule E of the proposed Final Judgment.  This program was intended to enable breeders to use sophisticated molecular technology to aid in the selection of promising lines to advance to the next breeding stage. Monsanto anticipated that Stoneville varieties developed through the MAB program would reach the market by 2011, and that MAB would be the primary development source for the varieties that Stoneville would commercialize throughout the next decade.[2]

*Cotton States Germplasm*:  Defendants will divest to the acquirer a non-exclusive, royalty-free license to sell and breed with varieties from Monsanto's recently established Cotton States program that Stoneville currently sells today.  In addition, as Monsanto typically uses germplasm in the Cotton States program that is owned by other entities (the "Cotton States Licensors"), Monsanto will relinquish to the acquirer the rights it possesses to work with the Cotton States Licensors to commercialize varieties that result from pre-existing crosses of Stoneville germplasm and Cotton States Licensors germplasm.[3]

---

[2]  Although the Advanced Exotic Yield Lines and MAB Populations provide the acquirer with promising germplasm for expanding Stoneville's market share, they provide a limited platform for introducing non-Monsanto traits because many of these lines are already introgressed with Monsanto traits.  The proposed Final Judgment addresses this limitation by requiring Defendants to allow the acquirer to breed out Monsanto traits from these lines (creating "Null Lines").  Further, Defendants are also required to provide any information necessary for the acquirer to obtain regulatory approval for varieties developed from Null Lines.

[3]  The proposed Final Judgment, however, does not require Monsanto to divest its Cotton States program.  Insisting upon divestiture of the program would have required obtaining consent from all of the Cotton States Licensors and could have resulted in disruption to the licensors'

*Other Germplasm*:  Defendants will divest all other germplasm in Defendant Monsanto's possession, except that Monsanto may retain, with certain limitations, certain categories of germplasm used predominantly in its trait development and licensing business.

3.    DPL Germplasm

DPL's success is due in significant part to its large collection of high-quality cotton germplasm from which it breeds high-yielding varieties.  To ensure that the acquirer will have the scale and scope necessary in the Southeast and MidSouth to be an effective and competitive platform for trait development, Defendants will divest twenty DPL conventional varieties.[4]

Eight of the twenty varieties are in the pedigrees of many of DPL's popular current varieties in the MidSouth and Southeast.  In particular, four of these varieties (AZ2099, DP491, Delta Pearl, and DP565) are the recurrent conventional parents for DPL commercial traited varieties that today account for approximately 55% of the cottonseed sold in the Southeast (where Stoneville presently holds only an 8% share of sales).  Delta Pearl is the parent of the high-yielding DPL555, which is by far the dominant cottonseed variety in the Southeast.

The twelve other divested DPL varieties constitute a significant portion of DPL's breeding pipeline for the MidSouth and Southeast and represent the varieties, and breeding stock for the varieties, that DPL had chosen to bring to market over the next decade.  These twelve varieties were bred at the DPL breeding stations that focus on developing germplasm well suited for the

---

financially beneficial current contractual and business relationships with Monsanto.  Rather, this divestiture provides Stoneville the ability to continue working with the germplasm that it had been developing prior to the acquisition.

[4]  In 2006, DPL purchased rights to germplasm owned by Syngenta.  Under the proposed Final Judgment, Defendants will divest these conventional lines to the acquirer in addition to the twenty lines discussed above.

16

MidSouth and Southeast. Over the past four years, each of these twelve varieties has been ranked by DPL during the regular course of business as falling within DPL's top category for conventional lines based on the variety's performance characteristics, such as yield, fiber quality, and disease resistance. The superiority of these twelve lines is underscored by the fact that DPL selected them for introgression with the traits that DPL was developing with Syngenta, as well as for introgression with Monsanto's latest insect-resistant and herbicide-tolerant traits.

The proposed Final Judgment permits Defendants to retain a license to continue using these twenty lines to breed new varieties and to sell exclusively varieties that contain only Monsanto's traits. This exception to total divestiture (*i.e.*, permitting Defendants to continue selling varieties currently in the market and continue breeding with the divested varieties) is necessary to preserve DPL's current competitiveness, prevent disruption to its breeding program, and provide DPL the ability to compete effectively in the future. The acquirer of the Enhanced Stoneville Assets will have use of these varieties for its breeding program and will have rights to commercialize varieties (including in the MidSouth and Southeast) that contain traits being developed by other trait providers, either alone or in combination with Monsanto's traits.[5] With these rights, the acquirer will be in a position to provide trait developers with a competitive alternative to DPL going forward.

The proposed Final Judgment allows Defendants to continue, for a limited period of time,

---

[5] The proposed Final Judgment limits the acquirer in one respect with regard to non-Monsanto traits. For seven years, Monsanto may prevent it from "triple-stacking" in the twenty varieties a Monsanto glyphosate-tolerant trait, a Monsanto insect-resistant trait, and any non-glyphosate herbicide-tolerant trait available at the time the Complaint was filed. Nothing in the decree, however, prohibits Monsanto or the acquirer from commercializing such a triple-stacked cottonseed if licenses could be obtained from all affected rights-holders.

to sell conventional versions of some of the divested DPL varieties currently being sold by DPL in and outside of the United States, providing for a continuity of supply of conventional cottonseed.

      4.      <u>Defendant Monsanto Must Divest DPL if Enhanced Stoneville Assets Are Not Divested in a Timely Manner</u>

In merger cases where the United States seeks a divestiture remedy, it requires completion of the divestitures within the shortest time period reasonable under the circumstances.  In this case, the proposed Final Judgment provides that Defendants must complete the divestiture within ninety (90) calendar days after the filing of the Complaint.  Defendants must use their best efforts to divest the Enhanced Stoneville Assets as expeditiously as possible.  The United States, in its sole discretion, may grant one or more extensions of time, not to exceed sixty (60) calendar days in total.

In the event that Defendants do not accomplish the divestiture of the Enhanced Stoneville Assets within the time period permitted in the proposed Final Judgment, the proposed Final Judgment provides that Defendant Monsanto shall divest DPL within sixty (60) days.  Requiring divestiture of the acquired company would be necessary to ensure the full restoration of competition as quickly as possible should Defendants not be able to divest the Enhanced Stoneville Assets in an acceptable manner.

If the Defendant Monsanto has not divested DPL within the time period permitted by the proposed Final Judgment, then a trustee shall be appointed by the Court upon application of the United States.  The proposed Final Judgment provides that Monsanto will pay all costs and expenses of the trustee.  The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is

accomplished.  After the trustee's appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth the trustee's efforts to accomplish the divestiture of DPL.  At the end of ninety (90) calendar days, if the divestiture has not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

**B.**      *The Syngenta/VipCot Divestiture*

The proposed Final Judgment requires Defendants to divest to Syngenta the VipCot Assets listed in Schedule C of the proposed Final Judgment.  This divestiture seeks to minimize any delay the acquisition could cause in the commercialization of cottonseed containing VipCot, Syngenta's insect-resistant trait technology that would compete against Monsanto's Bollgard family of traits.  The VipCot assets include forty-three lines of DPL germplasm into which DPL has incorporated VipCot, along with performance data and other information.[6]  These lines are based on the most promising germplasm that DPL has in its development pipeline for geographies across the Cotton Belt, including the MidSouth and Southeast.  They are at various stages of development, with DPL anticipating commercializing varieties from five of these lines as early as 2009, three in 2010 or 2011, and the remainder in 2011 and beyond.

The lines will be transferred to Syngenta along with certain rights to allow Syngenta, by itself or working with others, to bring these varieties to market.  Syngenta will have exclusive rights to commercialize varieties developed from these lines so long as the variety has at least one

---

[6]  One of the forty-three lines is a line that DPL purchased from Syngenta in 2006 into which DPL introduced VipCot.

of the Syngenta trait events listed in Schedule C of the proposed Final Judgment, which includes the events that form VipCot.  Syngenta will also have exclusive rights to breed with the Syngenta-traited versions of these lines.  To facilitate breeding, Monsanto will provide Syngenta the "recurrent parent" conventional germplasm for each of the divested lines until December 21, 2014, which will allow Syngenta to complete development of these lines and add other traits.

The proposed Final Judgment also requires Monsanto to offer Syngenta a license to Roundup Ready Flex so that Syngenta can commercialize these VipCot lines stacked with Roundup Ready Flex.  Such a license will permit Syngenta to advance these lines by introgressing Roundup Ready Flex into them.  It will also permit Syngenta to sell, either independently or in conjunction with an established cottonseed company with a Roundup Ready Flex license, varieties stacked with VipCot and Flex.

The VipCot divestiture to Syngenta will therefore allow Syngenta to commercialize VipCot on the same schedule as DPL's anticipated commercialization and with the same range of options regarding stacking herbicide tolerance or other traits.  Defendants must use their best efforts to divest the VipCot Assets as expeditiously as possible and shall not take any action that would harm the VipCot Assets or in any way impede their divestiture.

## C.    *Changes in Third Party Licenses*

The proposed Final Judgment requires Monsanto to modify its third-party cottonseed trait and Cotton States Lines licenses no later than ten (10) days after the date of sale of the Enhanced Stoneville Assets, subject to the approval of the United States in its sole discretion.  Monsanto will modify its third-party cottonseed trait licenses to remove restrictions on the ability of licensees to develop, market, or sell cottonseed containing traits of companies other than

Monsanto, or to combine the licensed Monsanto traits in cottonseed with the traits of other companies. Monsanto will also modify the Cotton States Lines licenses to eliminate any provision that allows Monsanto to terminate the license if the licensee sells cottonseed containing other traits.

These changes will give these competing cottonseed companies the ability to partner with trait developers other than Monsanto without any financial penalty and to offer traits desired by farmers. Trait developers will thereby have access to close to half of the current U.S. cottonseed market, without having to deal with the combined Monsanto/DPL. These changes will ensure that Monsanto cannot prevent trait developers from bringing competing, non-Monsanto traits to the market.

### D.    *Notice Provisions*

The proposed Final Judgment provides that Defendant Monsanto shall provide notice to the United States prior to acquiring any company that develops and sells cottonseed in the United States or has developed, or has under development, traits for commercialization in cottonseed in the United States, unless the transaction is otherwise subject to Hart-Scott-Rodino reporting requirements. This provision will allow the United States to assess whether any such transaction would be likely to substantially lessen competition.

### IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act (15 U.S.C. § 15) provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any

private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act (15

U.S.C. § 16(a)), the proposed Final Judgment has no *prima facie* effect in any subsequent private

lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION
## OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the

Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later.  All comments received during this period will

be considered by the United States Department of Justice, which remains free to withdraw its

consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The

comments and the response of the United States will be filed with the Court and published in the

Federal Register.

Written comments should be submitted to:

Donna N. Kooperstein
Chief, Transportation, Energy & Agriculture Section
Antitrust Division
United States Department of Justice
325 Seventh Street, NW, Suite 500
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions against Monsanto's acquisition of DPL.  The United States is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition in the market for the development, production, and sale of traited cottonseed.  Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.    STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The APPA requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with amendments to the APPA in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court

23

deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. SBC Commc'ns, Inc.*, Nos. 05-2102 and 05-2103, 2007 WL 1020746, at *9-16 (D.D.C. Mar. 29, 2007) (assessing public interest standard under APPA and effect of 2004 amendments).[7] Courts in this circuit have held – both before and after the 2004 amendments – that the United States is entitled to deference in crafting its antitrust settlements, especially with respect to the scope of its complaint and the adequacy of its remedy, which are the "two most significant legal questions" relating to a public interest determination. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995); *SBC Commc'ns*, 2007 WL 1020746, at *12-*16.[8]

With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS,*

_____

[7] *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006) (substituting "shall" for "may" in directing relevant factors for court to consider and amending list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms). The 2004 amendments do not affect the substantial precedent in this and other circuits analyzing the scope and standard of review for APPA proceedings. *See SBC Commc'ns*, 2007 WL 1020746, at *9 ("[A] close reading of the law demonstrates that the 2004 amendments effected minimal changes . . . .").

[8] The *Microsoft* court explained that a court making a public interest determination under the APPA should consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *Microsoft*, 56 F.3d at 1458-62.

24

*Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666

(9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a
> proposed antitrust consent decree must be left, in the first instance, to the
> discretion of the Attorney General.  The court's role in protecting the public
> interest is one of insuring that the government has not breached its duty to
> the public in consenting to the decree.  The court is required to determine
> not whether a particular decree is the one that will best serve society, but
> whether the settlement is "*within the reaches of the public interest.*"  More
> elaborate requirements might undermine the effectiveness of antitrust
> enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[9]  In making its public interest

determination, a district court must accord due respect to the United States' prediction as to the

effect of proposed remedies, its perception of the market structure, and its views of the nature of

the case.  *SBC Commc'ns*, 2007 WL 1020746, at *16 (United States entitled to "deference" as to

"predictions about the efficacy of its remedies"); *United States v. Archer-Daniels-Midland Co.*,

272 F. Supp. 2d 1, 6 (D.D.C. 2003).

Court approval of a final judgment requires a standard more flexible and less strict than

the standard required for a finding of liability.  "[A] proposed decree must be approved even if it

falls short of the remedy the court would impose on its own, as long as it falls within the range of

acceptability or is 'within the reaches of public interest.'"  *United States v. AT&T Co.*, 552 F.

---

[9] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA]
is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F.
Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the
overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"),
*aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).  *See generally Microsoft*, 56
F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with
the allegations charged as to fall outside of the 'reaches of the public interest'").

Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F. Supp. at 716); *see also*

*United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the

consent decree even though the court would have imposed a greater remedy).  To meet this

standard, the United States "need only provide a factual basis for concluding that the settlements

are reasonably adequate remedies for the alleged harms."  *SBC Commc'ns*, 2007 WL 1020746, at

*16.

       Moreover, the Court's role under the APPA is limited to reviewing the remedy in

relationship to the violations that the United States has alleged in its Complaint, and does not

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against

that case."  *Microsoft*, 56 F.3d at 1459.  Because the "court's authority to review the decree

depends entirely on the government's exercising its prosecutorial discretion by bringing a case in

the first place," it follows that "the court is only authorized to review the decree itself," and not to

"effectively redraft the complaint" to inquire into other matters that the United States did not

pursue.  *Id*. at 1459-60.  As this Court recently confirmed in *SBC Communications*, courts "cannot

look beyond the complaint in making the public interest determination unless the complaint is

drafted so narrowly as to make a mockery of judicial power."  *SBC Commc'ns*, 2007 WL

1020746, at *14.

       In its 2004 amendments to the Tunney Act, Congress made clear its intent to preserve the

practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous

instruction "[n]othing in this section shall be construed to require the court to conduct an

evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2).

This language codified the intent of the original 1974 statute, expressed by Senator Tunney in the

legislative history: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."  119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).  Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."  *SBC Commc'ns*, 2007 WL 1020746, at *9.[10]

---

[10]  *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("[T]he Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## VIII.   **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: May 31, 2007                              Respectfully submitted,

FOR PLAINTIFF:


                                         _____/s/_____
                                         Jill A. Ptacek (WA Bar #18756)

                                         Trial Attorney
                                         U.S. Department of Justice
                                         Antitrust Division
                                         Transportation, Energy &
                                             Agriculture Section
                                         325 7th Street, NW,
                                         Suite 500
                                         Washington, DC 20004
                                         Telephone: (202) 307-6607
                                         Facsimile: (202) 307-2784