## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MONSANTO COMPANY and | ) |
| DELTA AND PINE LAND COMPANY, | ) |
| | ) |
| Defendants. | ) |

Civil Action No.: 1:07-cv-00992
Hon. Ricardo M. Urbina

## PLAINTIFF UNITED STATES'S MOTION AND MEMORANDUM IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final Judgment filed in this civil antitrust case. The proposed Final Judgment (which is attached) may be entered at this time without further hearing if the Court determines that entry is in the public interest. The defendants do not object to entry of the proposed Final Judgment without a hearing. The Competitive Impact Statement ("CIS") filed by the United States in the above-captioned matter on May 31, 2007, and the Response to Public Comments, filed by the United States on March 5, 2007 and published in the *Federal Register* on April 4, 2008, explain why entry of the proposed Final Judgment is in the public interest. The United States is filing simultaneously with this motion a Certificate of Compliance setting forth the steps taken by the parties to comply with all applicable provisions of the APPA and certifying that the statutory waiting period has expired.

Thus, the proposed Final Judgment may be entered at this time without further hearing if the Court determines that entry is in the public interest.

## MEMORANDUM

### I.    Background

On August 14, 2006, Monsanto entered into an agreement to acquire Delta and Pine Land Company ("DPL") for approximately $1.5 billion. Over the following nine and a half months, the United States conducted an extensive, detailed investigation into the competitive effects of the proposed transaction. The United States filed a civil antitrust complaint on May 31, 2007 seeking to enjoin the proposed acquisition. As explained more fully in the Complaint, CIS, and Response to Public Comments, the likely effect of this acquisition as originally proposed would have been to lessen competition substantially for traited cottonseed sales in two geographic regions – the MidSouth and the Southeast. In addition, the acquisition would have eliminated DPL as a partner independent of Monsanto for competing trait developers, substantially delaying or preventing the development and introduction of cottonseed containing non-Monsanto traits. Accordingly, Monsanto's acquisition of DPL would have substantially lessened competition between DPL and Monsanto for the development, breeding, and sale of traited cottonseed in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. As a result, farmers likely would have had fewer choices of, and face higher prices for, traited cottonseed.

At the same time the Complaint was filed, the United States also filed an Hold Separate and Preservation of Assets Stipulation and Order ("HSSO") and proposed Final Judgment that were designed to eliminate the anticompetitive effects of the acquisition in the affected areas. The proposed Final Judgment requires Monsanto to (a) divest the Enhanced Stoneville Assets to an

2

acquirer who is capable of using the assets to compete effectively, (b) divest to Syngenta certain DPL cottonseed lines containing transgenic cottonseed traits developed by Syngenta and to allow Syngenta to breed with those lines, and (c) modify certain trait licenses to eliminate restrictions on the use of non-Monsanto traits thereby permitting Monsanto trait licensees to breed and sell, without penalty, cottonseed containing non-Monsanto traits and cottonseed containing both licensed Monsanto traits and non-Monsanto traits. In the United States's judgment, the asset divestitures and license modifications required by the proposed Final Judgment remedy the competitive harms identified in the Complaint.

The United States and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. The United States and defendants have also stipulated that defendants will comply with the terms of the HSSO and the proposed Final Judgment from the date of the signing of the HSSO, pending entry of the proposed Final Judgment by the Court and the required divestitures.[1] Should the Court decline to enter the proposed Final Judgment, defendants have also committed to continue to abide by its requirements and those of the HSSO until the expiration of time for appeal.

## II.    Compliance with the APPA

The APPA requires a sixty-day period for the submission of comments on the proposed

---

[1] As explained in greater detail in the Response to Public Comments, (*see* 73 Fed. Reg. at 18615-16), Monsanto has already complied with the principal requirements of the proposed Final Judgment.

Final Judgment. 15 U.S.C. § 16(b). In compliance with the APPA, the United States filed the

CIS with the Court on May 31, 2007; published the proposed Final Judgment and CIS in the

*Federal Register* on June 15, 2007, *United States v. Monsanto Co. and Delta and Pine Land Co.*,

72 Fed. Reg. 33336-01, 2007 WL 1708314; and published summaries of the terms of the

proposed Final Judgment and CIS, together with directions for the submission of written

comments relating to the proposed Final Judgment, in *The Washington Post* for seven days

beginning on June 28, 2007 and ending on July 4, 2007. The sixty-day period for public

comments ended on August 27, 2007 and eleven comments were received. The United States

filed its Response to Public Comments and the comments themselves with this Court on March 4,

2008, and published the Response and the comments in the Federal Register on April 4, 2008, 73

Fed. Reg. 18611 (2008). The Certificate of Compliance filed simultaneously with this Motion

certifies that all the requirements of the APPA have now been satisfied.

### III.    Standard of Judicial Review

Before entering the proposed Final Judgment, the Court is to determine whether the

Judgment "is in the public interest." 15 U.S.C. § 16(e). In making that determination, the Court

shall consider:

A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

4

15 U.S.C. § 16(e).

In its CIS filed on May 31, 2007 and its Response to Public Comments filed on March 4, 2008, the United States has explained the meaning and proper application of the public interest standard under the APPA and now incorporates those statements herein by reference. The public, including affected competitors and customers, has had the opportunity to comment on the proposed Final Judgment as required by law. The proposed Final Judgment is within the range of settlements consistent with the public interest.

IV.    **Conclusion**

For the reasons set forth in this Motion and Memorandum, the CIS, and the Response to Public Comments, the Court should find that the proposed Final Judgment is in the public interest and should enter the proposed Final Judgment without further hearings. The United States respectfully requests that the proposed Final Judgment be entered as soon as possible.


Dated: April 15, 2008                                    Respectfully submitted,


                                                         Jill A. Ptacek (WA Bar #18756)

                                                         Trial Attorney
                                                         U.S. Department of Justice
                                                         Antitrust Division
                                                         Transportation, Energy &
                                                            Agriculture Section
                                                         325 7th Street, NW,
                                                         Suite 500
                                                         Washington, DC 20004
                                                         Telephone: (202) 307-6607
                                                         Facsimile: (202) 307-2784

## CERTIFICATE OF SERVICE

I hearby certify that on the 15th day of April 2008, I caused a copy of the foregoing

Plaintiff United States's Motion and Memorandum in Support of Entry of Final Judgment and

Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act to be

served, by U.S. mail, postage prepaid, and by electronic mail to the attorneys listed below.

_____
Jill Ptacek

Counsel for Defendant Monsanto Corporation
M.J. Moltenbrey
Freshfields Bruckhaus Deringer LLP
701 Pennsylvania Avenue, NW
Suite 600
Washington, DC 20004
Telephone: (202) 777-4500
Facsimile: (202) 777-4555
Email: mj.moltenbrey@freshfields.com

Counsel for Defendant Delta and Pine Land Corporation
Charles F. Rule
Cadwalader, Wickersham & Taft LLP
1201 F Street, NW
Washington, DC 20004
Telephone: (202) 862-2200
Facsimile: (202) 862-2400
Email: rick.rule@cwt.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Action No.: 1:07-cv-00992 <br> Hon. Ricardo M. Urbina |
| MONSANTO COMPANY and <br> DELTA AND PINE LAND COMPANY, | Filed: |
| Defendants. | |

## FINAL JUDGMENT

WHEREAS, Plaintiff United States of America filed its Complaint on May 31, 2007, Plaintiff and Defendants, Monsanto Company ("Monsanto") and Delta and Pine Land Company ("DPL"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets and alterations of certain existing license terms by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, Plaintiff requires Defendants to make certain divestitures and alter

certain existing license terms for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to Plaintiff that the divestitures and license term alterations required below can and shall be made and that Defendants shall later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture or license alteration provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I.    **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    **Definitions**

As used in this Final Judgment:

A.    "Acquirer of the Enhanced Stoneville Assets" means the entity or entities to whom Defendant Monsanto divests the Enhanced Stoneville Assets.

B.    "Cotton States" means Defendant Monsanto's cotton variety licensing business pursuant to which Defendant Monsanto licenses other cottonseed companies to produce or sell Defendant Monsanto's own cotton varieties, cotton varieties Defendant Monsanto in-licenses from other breeders, or cotton varieties Defendant Monsanto produces from such varieties.

C.      "DPL" means Defendant Delta and Pine Land Company, a Delaware corporation with its headquarters in Scott, Mississippi, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, interests in partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

D.      "DPL Acquirer" means the entity to whom Defendant Monsanto divests Defendant DPL.

E.      "Monsanto" means Defendant Monsanto Company, a Delaware corporation with its headquarters in St. Louis, Missouri, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

F.      "Stoneville" means all assets used exclusively or primarily in, or to support, the U.S. business of Stoneville Pedigreed Seed Company, including, but not limited to the assets described in Schedule A.

G.      "Enhanced Stoneville Assets" means Stoneville and the additional assets, properties, and rights listed in Schedule B.

H.      "Syngenta" means Syngenta Crop Protection AG, a Swiss corporation with its headquarters in Basel, Switzerland, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

I.      "VipCot Assets" means the assets, properties, and rights listed in Schedule C.

### III.  **Applicability**

A.      This Final Judgment applies to Defendants Monsanto and DPL, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets that include the Enhanced Stoneville Assets or the VipCot Assets, they shall require, as a condition of the sale or other disposition, that the purchaser(s) agree to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the acquirers of the assets divested pursuant to this Final Judgment.

### IV.  **Divestiture of Enhanced Stoneville Assets**

A.      Defendants are ordered and directed, in accordance with the terms of this Final Judgment, within ninety (90) calendar days after the filing of the Complaint in this matter, to divest the Enhanced Stoneville Assets to an acquirer acceptable to Plaintiff in Plaintiff's sole discretion. Defendants shall use their best efforts to accomplish the divestiture of the Enhanced Stoneville Assets as expeditiously as possible. Plaintiff, in its sole discretion, may grant one or more extensions of this time period, not to exceed sixty (60) calendar days in total, and shall notify the Court in each such circumstance.

B.      Within two (2) business days following execution of a definitive agreement or agreements for the divestiture of the Enhanced Stoneville Assets, or the filing of this Final Judgment, whichever is later, Defendants shall notify Plaintiff in writing of the proposed

4

divestiture. The notice shall set forth the details of the proposed divestiture, including a list of

the name, address, and telephone number of each person who offered, or expressed an interest in

or desire, to acquire any ownership interest in the Enhanced Stoneville Assets, together with full

details of the same. Defendants need not include in this notice information about any persons

previously identified in an affidavit filed in compliance with this Final Judgment as offering, or

expressing an interest in or desiring, to acquire any ownership interest in the Enhanced Stoneville

Assets. Defendants shall include with the notice a copy of the divestiture agreement or

agreements and copies of any other agreements entered into by either or both of the Defendants

and the proposed Acquirer of the Enhanced Stoneville Assets since the Complaint in this matter

was filed, or up to three (3) months before the filing of the Complaint in this matter. Defendants

may incorporate by reference in this notice any responsive information or documents previously

provided to Plaintiff, provided that Defendants identify with specificity when the information or

documents were previously provided and, if the information or documents were part of a larger

submission, where in the submission the information or documents may be located.

      C.     Within fifteen (15) calendar days of receipt by Plaintiff of such notice, Plaintiff

may request from Defendants, the proposed Acquirer of the Enhanced Stoneville Assets, or any

other third party, additional information concerning the proposed divestiture, the proposed

Acquirer of the Enhanced Stoneville Assets, and any other potential acquirer. Defendants shall

furnish any additional information requested of Defendants within fifteen (15) calendar days of

the receipt of the request, unless Defendants and Plaintiff shall otherwise agree.

      D.     Within fifteen (15) calendar days after receipt of the notice or within ten (10)

5

calendar days after Plaintiff has been provided the additional information requested from

Defendants, the proposed Acquirer of the Enhanced Stoneville Assets, and any third party,

whichever is later, Plaintiff shall provide written notice to Defendants stating whether or not it

objects to the proposed divestiture. If Plaintiff provides written notice that it does not object, the

divestiture may be consummated. Absent written notice that Plaintiff does not object to the

proposed Acquirer of the Enhanced Stoneville Assets or upon objection by Plaintiff, the

divestiture of the Enhanced Stoneville Assets to that proposed Acquirer shall not be

consummated.

E.    The divestiture of the Enhanced Stoneville Assets shall be accomplished in such a

way as to satisfy Plaintiff, in its sole discretion, that the Enhanced Stoneville Assets can and shall

be used by the Acquirer of the Enhanced Stoneville Assets to operate a viable, ongoing business

engaged in the development, production and sale of traited cottonseed. The divestiture of the

Enhanced Stoneville Assets:

(1)    shall be made to an Acquirer of the Enhanced Stoneville Assets that, in

Plaintiff's sole judgment, has the intent and capability (including the

necessary managerial, operational, technical, and financial capability and

intellectual property rights) of competing effectively in the business of

developing, producing and selling traited cottonseed in the United States,

including a credible commitment to the traited cottonseed market;

(2)    shall be accomplished so as to satisfy Plaintiff, in its sole discretion, that

the divestiture shall not result in the substantial lessening of competition

6

for the development, production, and sale of traited cottonseed in any

geographic area; and

(3)    shall be accomplished so as to satisfy Plaintiff, in its sole discretion, that

none of the terms of any agreement between an Acquirer of the Enhanced

Stoneville Assets and Defendants give Defendants the ability unreasonably

to raise the Acquirer's costs, to lower the Acquirer's efficiency, or

otherwise to interfere in the ability of the Acquirer to compete effectively.

F.    Defendants shall provide to the Acquirer of the Enhanced Stoneville Assets and

Plaintiff information relating to the personnel primarily involved in the operation of Stoneville to

enable the Acquirer of the Enhanced Stoneville Assets to make offers of employment.

Defendants shall not interfere with any negotiations by the Acquirer of the Enhanced Stoneville

Assets to employ any such personnel.

G.    For a period of two (2) years from the filing of the Complaint in this matter,

Defendants shall not solicit to hire, or hire, any individual primarily involved in the operation of

Stoneville on the date of the filing of the Complaint in this matter who receives a substantially

equivalent offer of employment from the Acquirer, unless such individual is terminated or laid

off by the Acquirer, or the Acquirer agrees that Defendants may solicit and employ that

individual.

H.    Defendants shall not take any action that shall impede in any way the operation,

use or divestiture of the Enhanced Stoneville Assets.

I.    Defendants shall warrant to the Acquirer of the Enhanced Stoneville Assets that

7

there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset that shall have a material adverse effect on the operation of the Enhanced Stoneville Assets, and that following the sale of the Enhanced Stoneville Assets, Defendants shall not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the use or operation of the Enhanced Stoneville Assets based on actions or inactions that existed prior to the date of divestiture.

## V.    **Divestiture of VipCot Assets**

A.      Defendants are ordered and directed, in accordance with the terms of this Final Judgment, to offer Syngenta the VipCot Assets listed in the attached Schedule C within thirty (30) calendar days of the filing of the Complaint in this matter.  The offer shall remain open for at least six (6) months.  Defendants shall use their best efforts to accomplish the divestiture of the VipCot Assets as expeditiously as possible, but in any event no later than ninety (90) calendar days after the divestiture of the Enhanced Stoneville Assets or thirty (30) calendar days after Syngenta accepts the offer, whichever is latest.  Plaintiff, in its sole discretion, may extend the time period for Defendants to divest the VipCot Assets to Syngenta by granting one or more extensions, not to exceed ninety (90) calendar days in total, and shall notify the Court in each such circumstance.

B.      Prior to transmitting to Syngenta the offer for the assets described in the attached Schedule C, Defendants shall provide Plaintiff with copies of the offer for the approval of the Plaintiff in its sole discretion.  Along with the offer, Defendants shall provide Plaintiff copies of any other agreements not previously provided to Plaintiff entered into by either or both of the

8

Defendants and Syngenta since the Complaint in this matter was filed, or up to three (3) months before the filing of the Complaint in this matter. Within five (5) business days following receipt of the offer, Plaintiff shall provide written notice to Defendants stating whether the offer must be amended to meet the objectives of the divestiture of the VipCot Assets. Absent written notice that Plaintiff does not object to the offer, the divestiture of the VipCot Assets to Syngenta pursuant to the offer shall not proceed. Upon objection by Plaintiff, Defendants shall alter the terms of the offer to satisfy Plaintiff in its sole discretion.

C.      Defendants shall permit Syngenta to have reasonable access to personnel and to any and all financial, operational, or other documents and information relating to the VipCot Assets customarily provided as part of a due diligence process.

D.      Defendants shall not take any action that shall harm the VipCot Assets or impede in any way the divestiture of the VipCot Assets.

## VI.    **Changes in Third Party Licenses**

A.      Defendant Monsanto agrees to offer to its licensees, within thirty (30) calendar days of the date of the sale of the Enhanced Stoneville Assets, to make the following changes to its third-party cottonseed trait and Cotton States licenses, subject to the approval of Plaintiff in its sole discretion:

1.      Current Cotton Insect Resistance and Herbicide Tolerance Trait Licensing Agreements: Defendant Monsanto shall modify its current cottonseed trait licenses to provide the licensees with the flexibility Defendant DPL currently has to develop, market or sell cottonseed containing non-Monsanto traits by removing any provisions that require

9

or incentivize the licensee to develop, market or sell cottonseed containing only traits from Defendant Monsanto.

        2.      Cotton States Licenses: Defendant Monsanto shall modify its Cotton States licenses to eliminate any provision that allows Defendant Monsanto to terminate the license if the licensee sells cottonseed containing non-Monsanto traits in brands not licensed under the Cotton States license.

        B.      Prior to making the offers, and no later than five (5) days after the date of sale of the Enhanced Stoneville Assets, Defendant Monsanto shall provide Plaintiff with copies of the offers for the approval of Plaintiff in its sole discretion. Within five (5) days of receipt of the offers to modify the license agreements, Plaintiff shall provide written notice to Defendant Monsanto stating whether the offers must be amended. Absent written notice that Plaintiff does not object to the offers, Defendant Monsanto may not proceed with offering the modifications to the licensees. Upon objection by Plaintiff, Defendant Monsanto shall alter the terms of the offers to satisfy Plaintiff in its sole discretion. In the event any of the licensees do not accept the offer containing the modifications described in Section VI.A. as approved by Plaintiff in its sole discretion, Defendant Monsanto shall act as though such modification has been made and shall not enforce any license provision that is the subject of any such modification.

## VII.    Divestiture of Defendant DPL

        A.      If Defendants have not divested the Enhanced Stoneville Assets by the end of the time period permitted by this Final Judgment, Defendants shall notify Plaintiff of that fact in writing. Defendant Monsanto shall then divest DPL within sixty (60) days. If Defendant Monsanto has not divested Defendant DPL by the end of the sixty-day period, Defendant

Monsanto shall notify Plaintiff of that fact in writing. Upon application of Plaintiff, the Court

shall appoint a trustee selected by Plaintiff and approved by the Court to effect the divestiture of

Defendant DPL.

B.    Defendant Monsanto shall use its best efforts to assist the trustee in accomplishing

the required divestiture of Defendant DPL, including its best efforts to effect all necessary

regulatory approvals. The trustee and any consultants, accountants, attorneys, and other persons

retained by the trustee shall have full and complete access to the personnel, books, records, and

assets at the facilities to be divested, and Defendant Monsanto shall develop financial or other

information relevant to the assets to be divested customarily provided in a due diligence process

as the trustee may reasonably request, subject to reasonable protection for confidential

commercial information. In addition, Defendant Monsanto shall:

(1)    permit prospective acquirers of Defendant DPL who have been invited to

submit binding bids for Defendant DPL to have reasonable access to

Defendant DPL's personnel and to make such inspection of Defendant

DPL and any and all financial, operational, or other documents and other

information as may be relevant to the divestiture of Defendant DPL,

subject to reasonable protection for confidential commercial information;

(2)    provide the DPL Acquirer and Plaintiff information relating to the

personnel of Defendant DPL to enable the DPL Acquirer to make offers of

employment;

(3)    take no action to interfere with any negotiations by the DPL Acquirer to

employ any Defendant DPL employee;

11

(4)    take no action to interfere with or to impede the trustee's accomplishment

of the divestiture of Defendant DPL;

(5)    warrant to the DPL Acquirer that on the date of sale each asset shall be in

the same condition as when Defendant Monsanto acquired Defendant

DPL, except for the harvesting of cotton plants and selection of lines in the

ordinary course of business, and ordinary wear and tear of assets and

facilities;

(6)    warrant to the DPL Acquirer that there are no material defects in the

environmental, zoning or other permits pertaining to the operation of each

asset that have arisen since Defendant Monsanto acquired Defendant DPL;

and

(7)    shall not, following divestiture of Defendant DPL, undertake, directly or

indirectly, any challenges to the environmental, zoning, or other permits

relating to the operation of Defendant DPL, or otherwise take any action

that shall impede in any way the permitting, operation, or divestiture of

Defendant DPL.

C.    Unless Plaintiff otherwise consents in writing, the divestiture of Defendant DPL

pursuant to this Section of the Final Judgment, whether accomplished by Defendant Monsanto or

a trustee, shall include the entirety of Defendant DPL, and shall be accomplished in such a way

as to satisfy Plaintiff, in its sole discretion, that (a) Defendant DPL shall remain no less viable

than when Defendant Monsanto acquired it, (b) the divestiture of Defendant DPL shall remedy

the competitive harm alleged in the Complaint, and (c) none of the terms of any agreement

between a DPL Acquirer and Defendant Monsanto give Defendant Monsanto the ability

unreasonably to raise that person's costs, to lower that person's efficiency, or otherwise to

interfere in the ability of that person to compete effectively.

D.    The trustee shall have the power and authority to accomplish the divestiture of

Defendant DPL at the earliest possible time to an acquirer acceptable to Plaintiff, in its sole

discretion, at such price and on such terms as are then obtainable upon reasonable effort by the

trustee, and shall have such other powers as the Court deems appropriate.  Subject to Section

VII.F of this Final Judgment, the trustee shall have the power and authority to hire at the cost and

expense of Defendant Monsanto any investment bankers, attorneys, or other agents who are

reasonably necessary in the judgment of the trustee to assist in the divestiture of Defendant DPL

and who shall be solely accountable to the trustee.

E.    Defendant Monsanto shall not object to a sale by the trustee on any ground other

than the trustee's malfeasance.  Any such objections by Defendant Monsanto must be conveyed

in writing to Plaintiff and the trustee within ten (10) calendar days after the trustee has provided

the notice required under this Section.

F.    The trustee shall serve at the cost and expense of Defendant Monsanto, on such

terms and conditions as Plaintiff approves, and shall account for all monies derived from the sale

of the assets sold by the trustee and all costs and expenses so incurred.  After approval by the

Court of the trustee's accounting, including fees for its services and those of any professionals

and agents retained by the trustee, all remaining money shall be paid to Defendant Monsanto, and

the trust shall then be terminated.  The compensation of the trustee and of any professionals and

agents retained by the trustee shall be reasonable in light of the value of Defendant DPL and

13

based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture of Defendant DPL and the speed with which it is accomplished, but timeliness is paramount.

G.    After its appointment, the trustee shall file monthly reports with Plaintiff, Defendant Monsanto, and the Court setting forth the trustee's efforts to accomplish the divestiture of Defendant DPL, provided however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court and Defendant Monsanto's copy of the report shall have such confidential information redacted.  Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in Defendant DPL, and shall describe in detail each contact with any such person during that period.  The trustee shall maintain full records of all efforts made to divest Defendant DPL.

H.    If the trustee has not accomplished such divestiture of Defendant DPL within ninety (90) calendar days after its appointment, the trustee shall file promptly with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture of Defendant DPL; (2) the reasons, in the trustee's judgment, why the required divestiture of Defendant DPL has not been accomplished; and (3) the trustee's recommendations.  To the extent such report contains information that the trustee deems confidential, such report shall not be filed in the public docket of the Court.  The trustee shall at the same time furnish such report to Plaintiff. Plaintiff shall have the right to make additional recommendations consistent with the purpose of

14

the trust. The Court shall enter thereafter such orders as it shall deem appropriate to carry out the

purpose of this Final Judgment which may, if necessary, include extending this Final Judgment

and the term of the trustee's appointment by a period requested by Plaintiff.

I.      The trustee shall notify Plaintiff and Defendant Monsanto within two (2) business

days following execution of a definitive agreement for the sale of Defendant DPL. The notice

shall set forth the details of the proposed divestiture of Defendant DPL and list the name,

address, and telephone number of each person not previously identified who offered or expressed

an interest in or desire to acquire any ownership interest in Defendant DPL, together with full

details of the same.

J.      Within fifteen (15) calendar days of receipt by Plaintiff of such notice, Plaintiff

may request from Defendants, the proposed DPL Acquirer, any other third party, or the trustee,

additional information concerning the proposed divestiture of Defendant DPL, the proposed DPL

Acquirer, and any other potential acquirer. Defendants and the trustee shall furnish any

additional information requested within fifteen (15) calendar days of the receipt of the request,

unless the Defendants and Plaintiff shall otherwise agree.

K.      Within thirty (30) calendar days after receipt of the notice or within twenty (20)

calendar days after Plaintiff has been provided the additional information requested from

Defendant Monsanto, the proposed DPL Acquirer, any third party, and the trustee, whichever is

later, Plaintiff shall provide written notice to Defendant Monsanto and the trustee stating whether

or not it objects to the proposed divestiture of Defendant DPL. If Plaintiff provides written

notice that it does not object, the sale of Defendant DPL may be consummated, subject only to

Defendant Monsanto's limited right to object to the sale under Section VII.E of this Final

Judgment. Absent written notice that Plaintiff does not object to the proposed DPL Acquirer or upon objection by Plaintiff, the sale of Defendant DPL shall not be consummated. Upon objection by Defendant Monsanto under Section VII.E, a sale of Defendant DPL proposed under this Section shall not be consummated unless approved by the Court.

## VIII.    Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or Section VII of this Final Judgment.

## IX.    Hold Separate

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate and Preservation of Assets Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## X.    Affidavits

A.    Within ten (10) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Sections IV and V, Defendants shall deliver to Plaintiff an affidavit as to the fact and manner of its compliance with Sections IV, V, and VI of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Enhanced Stoneville Assets, and shall describe in detail each contact with any such person during that period, including a summary of all conversations (1) between Defendants and any Acquirer of the

16

Enhanced Stoneville Assets, and (2) between Defendants and Syngenta with respect to the VipCot Assets. Defendants may incorporate by reference in any such affidavit any responsive information or documents previously provided to Plaintiff, provided however, that Defendants identify with specificity when the information or documents were previously provided and, if the information or documents were part of a larger submission, where in the submission the information or documents may be located. Assuming the information set forth in the affidavit is true and complete, any objection by Plaintiff to information provided by Defendants, including any limitation on information, shall be made within fourteen (14) days of receipt of such affidavit.

B.      Defendants shall keep all records of all efforts made to preserve and divest the Enhanced Stoneville Assets and VipCot Assets until one year after each such divestiture has been completed.

## XI.    **Compliance Inspection**

A.      For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)      access during Defendants' office hours to inspect and copy, or at Plaintiff's option, to require Defendants to provide copies of all books, ledgers, accounts,

17

records and documents in the possession, custody, or control of Defendants,

relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, Defendants' officers, employees,

or agents, who may have their individual counsel present, regarding such matters.

The interviews shall be subject to the reasonable convenience of the interviewee

and without restraint or interference by Defendants.

B.     Upon the written request of a duly authorized representative of the Assistant

Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or

responses to written interrogatories, under oath if requested, relating to any of the matters

contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this Section shall

be divulged by Plaintiff to any person other than an authorized representative of the executive

branch of the United States, except in the course of legal proceedings to which the United States

is a party (including grand jury proceedings), or for the purpose of securing compliance with this

Final Judgment, or as otherwise required by law.

D.     If, at the time information or documents are furnished by Defendants to Plaintiff,

Defendants represent and identify in writing the material in any such information or documents

to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil

Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of

protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then Plaintiff shall give

Defendants ten (10) calendar days' notice prior to divulging such material in any legal

18

proceeding (other than a grand jury proceeding).

## XII.    Notification

A.    Unless such transaction is otherwise subject to the reporting and waiting period

requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15

U.S.C. § 18a (the "HSR Act"), Defendant Monsanto, without providing advance notification to

Plaintiff, shall not directly or indirectly acquire (1) voting securities, (2) all or substantially all of

the cotton germplasm, or (3) substantially all of the assets relating to cottonseeds or cottonseed

traits, of any company that develops and sells cottonseed in the United States, or any company

that has developed, or has under development traits for commercialization in cottonseed in the

United States, where such acquisition would be reportable under the HSR Act but for a failure to

satisfy the thresholds of 15 U.S.C. § 18a(a)(2).

B.    Such notification shall be provided to Plaintiff in the same format as, and per the

instructions relating to the Notification and Report Form set forth in the Appendix to Part 803 of

Title 16 of the Code of Federal Regulations as amended, except that the information requested in

Items 5 through 9 of the instructions must be provided only about cottonseeds or transgenic traits

that shall be or could be used in cottonseeds.  Notification shall be provided at least thirty (30)

days prior to acquiring any such interest, and shall include, beyond what may be required by the

applicable instructions, the names of the principal representatives of the parties to the agreement

who negotiated the agreement, and any management or strategic plans discussing the proposed

transaction.  If within the thirty (30) day period after notification, representatives of Plaintiff

make a written request for additional information, Defendant Monsanto shall not consummate

the proposed transaction or agreement until twenty (20) days after submitting all such additional information. Early termination of the waiting periods in this paragraph may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section shall be broadly construed and any ambiguity or uncertainty regarding the filing of notice under this Section shall be resolved in favor of filing notice.

## XIII.    No Reacquisition

If Defendant Monsanto divests the Enhanced Stoneville Assets and the VipCot Assets, Defendant Monsanto may not reacquire any part of the Enhanced Stoneville Assets or the VipCot Assets during the term of this Final Judgment. If Defendant Monsanto divests Defendant DPL, it may not reacquire any part of Defendant DPL during the term of this Final Judgment.

## XIV.    Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.    Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

### XVI.    **Public Interest Determination**

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and Plaintiff's responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.


**Date:**  _____



_____

**Ricardo M. Urbino**
**United States District Judge**

21

## DEFINITIONS FOR SCHEDULES

1. "Advanced Exotic Yield Lines" means the Breeding populations and proprietary Lines created by Defendant Monsanto from a cross between *Gossypium hirsutum* and *Gossypium barbadense* that are identified in Schedule D.

2. "Backcross" means to cross a hybrid with one of its parents and then to cross the resulting progeny with the same parent Line (perhaps multiple times) in order to develop progeny with a genetic make up that approximates the genetic make up of that parent while retaining certain desirable characteristics of the genetic make up of the other parent of the hybrid.

3. "Breed" means to purposefully modify the Germplasm of a plant so as to alter its genetic make up, and to develop the progeny from the altered Germplasm.

4. "DPL Marker Data" means Fingerprints that Defendant Monsanto shall create for the DPL Germplasm being divested pursuant to Schedule B.2.

5. "Donor Lines" means the cotton Lines used by Defendant Monsanto to create or transmit novel cotton traits or events, and identified in Schedule F.

6. "Fingerprint" means a record of the presence or absence of genetic markers for which a Line has been tested.

7. "Germplasm" means a collection of heterozygous and homozygous cotton plants or parts thereof. For purposes of Schedules B and C of this Final Judgment, when the Defendants are required to convey Germplasm to a party, the Defendant may satisfy that obligation by conveying that Germplasm in seed form, or if necessary, in potted plant form.

8. "Introgress" means to move a gene from one cotton plant into another.

9. "Line" means a set of cottonseed or plants that share a common reasonably homogenous genotype that originate from a cross between two cotton plants.

10. "MAB Populations" means the Germplasm populations for which Defendant Monsanto has conducted significant marker analyses that are identified in Schedule E.

11. "Monsanto B.t. Gene" means a DNA molecule, or a replicate thereof, developed and out-licensed by Defendant Monsanto for use in commercial cottonseed in the United States, and which encodes a B.t. toxin that when present in cotton plants results in those plants being toxic to lepidopteran insects.

1

12. "Monsanto Cotton Traits" means: (1) the transgenic event denominated "Event 531" currently sold under the "Bollgard" brand; (2) the transgenic event denominated "Event 15985" currently sold under the "Bollgard II" brand; (3) the transgenic event denominated "Event 1445" currently sold under the "Roundup Ready" brand; and (4) the transgenic event denominated "Event 88913" currently sold under the "Roundup Ready Flex" brand, or any combination thereof.

13. "Monsanto Marker Library" means (1) two collections of genetic information concerning variations in the genetic make up of *Gossypium*, specifically a set of SSRs and a set of SNPs, and (2) cotton mapping data owned by Defendant Monsanto prior to its acquisition of Defendant DPL pursuant to the Merger Agreement.

14. "Monsanto Roundup Ready Gene" means a DNA molecule, or a replicate thereof, developed and out-licensed by Defendant Monsanto for use in commercial cottonseed in the United States, and which when present in cotton plants results in those plants exhibiting commercial tolerance to glyphosate herbicides.

15. "Null Line" shall mean a reasonably genetically homogenous Line of cotton that is selected from a cross in which one of the parents was from the Advanced Exotic Yield Lines or MAB populations and that does not contain one or more of the Monsanto Cotton Traits that was contained in the parental Advanced Exotic Yield Line or MAB population. A grant of a right to create a Null Line to the Acquirer of the Enhanced Stoneville Assets includes an obligation by Defendant Monsanto to provide the Acquirer of the Enhanced Stoneville Assets with assays, materials, and information regarding the Monsanto Cotton Trait(s) formerly in the Null Line necessary to obtain requisite regulatory approvals, provided the Acquirer of the Enhanced Stoneville Assets reimburses Defendant Monsanto its reasonable expenses in providing such assistance.

16. "Publicly Available Cotton Germplasm" means any non-Monsanto proprietary cotton Germplasm that has not been exclusively in-licensed by Defendant Monsanto.

17. "Recurrent Parent" means the parent to which successive Backcrosses are made in Backcross Breeding.

18. "Roundup Ready Flex" means the Monsanto Roundup Ready Gene denominated "Event 88913."

19. "SNP" (or Single Nucleotide Polymorphisms) means variations at a single position in a given DNA sequence, which occur within a population of cotton plants.

20. "SSR" (or Simple Sequence Repeat) means variations in the number of repetitions of a DNA

2

sequence.

21. "Transform" means to alter the genetic makeup of a cotton plant variety through means other than Breeding, for example, by the introduction of foreign genetic material.

## SCHEDULE A – STONEVILLE

1. <u>Cotton Germplasm</u>:  All U.S. Stoneville cotton Germplasm, including, for each variety, Line and population to be divested: all patents, patent applications and Plant Variety Protection Act certificates applied for or granted with respect to that Germplasm (and excluding any patents or patent applications on Monsanto cotton traits); and copies of all performance and other test results, phenotypic data, product descriptions, research data and any Fingerprint information.

2. <u>Physical Assets</u>:

    a.  Defendant Monsanto's interest in the real property at the following sites or locations:

        (1)  The manufacturing, storage and delinting facility at Stoneville, Mississippi;

        (2)  The research & development facility at Arcola, Mississippi;

        (3)  The research & development facility, including greenhouse and labs, at Memphis, Tennessee; and

        (4)  The manufacturing, storage and delinting and the Breeding and testing facilities at N. Powerline Road, Maricopa, Arizona.

    b.  Defendant Monsanto's interest in the leased real property at the following sites or locations:

        (1)  The land at Maricopa, Arizona;

        (2) The AgriCenter international research facility at Memphis, Tennessee;

        (3) The Memphis Redbirds Suite;

        (4) The Columbus & Greenville Railway Lease;

        (5) The delinting plant at Marble Hall, South Africa;

        (6) The property described in the W.B. Sutton Farms Partnership Lease;

        (7) The storage facility described in the Farmers Feed Storage Agreement;

        (8) The storage facility described in the David Storage Company Industrial Space

4

Lease; and

(9) The storage facility described in the Cascio Refrigerated Warehouse Agreement.

c.  At the option of the Acquirer of the Enhanced Stoneville Assets, Defendant Monsanto's interest in the real property at the following sites or locations:

(1)  The farm at Lubbock, Texas;

(2) The manufacturing, storage, and delinting facility at Big Spring, Texas;

(3) The research and development facility at Idalou, Texas;

(4) 7.2 acres in Idalou, Texas (leased); and

(5) 80 acres in Idalou, Texas (leased).

d.   All tangible assets other than Germplasm located at each of the locations identified in a. and b. above that are exclusively or primarily used in connection with the Stoneville U.S. branded business, including:

(1)  all manufacturing and agricultural equipment, tooling and fixed assets; personal property; materials; supplies; and other tangible property.

(2)  all existing drawings; blueprints; designs; plans for improvements or expansion; design protocols; specifications for materials; and specifications for parts and devices.

(3)  all safety procedures for the handling of materials and substances; and quality assurance and control procedures relating to the locations listed in a. and b. above or the tangible assets listed in this paragraph d.

(4)  business records relating to the Stoneville U.S. branded cottonseed business, including stock record books, minute books, direct customer or direct distributor lists; a list of names and addresses of U.S. cotton growers with Monsanto trait licenses; and other information to the extent related to the operation of the business during the past three years which is in the possession of or available to the Defendants.

e.  At the option of the Acquirer of the Enhanced Stoneville Assets, all tangible assets

5

other than Germplasm located at each of the locations identified in c. above that are exclusively or primarily used in connection with the Stoneville U.S. branded business, including:

> (1)  all manufacturing and agricultural equipment, tooling and fixed assets; personal property; materials; supplies; and other tangible property.

> (2)  all existing drawings; blueprints; designs; plans for improvements or expansion; design protocols; specifications for materials; and specifications for parts and devices.

> (3)  all safety procedures for the handling of materials and substances; and quality assurance and control procedures relating to the locations listed in c. above or the tangible assets listed in this paragraph e.

> (4)  business records relating to the Stoneville U.S. branded cottonseed business, including stock record books, minute books, direct customer or direct distributor lists; a list of names and addresses of U.S. cotton growers with Monsanto trait licenses; and other information to the extent related to the operation of the business during the past three years which is in the possession of or available to the Defendants.

f.  At the option of the Acquirer of the Enhanced Stoneville Assets, all equipment used exclusively or primarily in connection with the Stoneville branded cottonseed business stored at Monsanto sites at Leesburg, Georgia, Mt. Olive, North Carolina and Leland, Mississippi.

3.  Intangible Assets:

a.  Brand Names, Goodwill, and Trade Secrets – The Stoneville brand names, goodwill, and trade secrets relating to Stoneville's U.S. branded cottonseed business.  Defendant Monsanto may retain exclusive rights to the Stoneville brand in connection with the sale of Germplasm in Spain, Greece, and Turkey, such rights expire on a country-by-country basis with the term of the relevant current distributor agreements in Spain and Greece, and one (1) year from the date of divestiture of the Enhanced Stoneville Assets in Turkey, provided that in all cases the relevant distributors shall be allowed to sell any inventory of goods already packaged in containers bearing the Stoneville trademarks as of the relevant termination date.

6

b. Intangible and Contractual Rights:

(1) Exclusive rights to (a) Breeder records and/or notebooks, including pedigrees, relating to Stoneville U.S. cotton Germplasm, identities of non-public lines of Stoneville U.S. cotton Germplasm in breeding and trial results, including yield results (subject to the redaction of any data that may be included in such records relating to the identity of any non-public lines other than Stoneville U.S. cotton Germplasm), (b) existing fingerprints for Stoneville U.S. cotton Germplasm, and (c) quality control data relating to Stoneville U.S. cotton Germplasm (subject to Defendant Monsanto's right to keep under the control of its Law Department (i) one copy of such quality control data and (ii) access to the identities of any Stoneville U.S. cotton Germplasm present in trial results that also include results relating to non-public lines of Germplasm other than Stoneville U.S. cotton Germplasm; Monsanto's Law Department may not disclose this information to any other component of Monsanto).

(2) Non-exclusive rights to, and the tangible embodiments of, (i) non-proprietary procedures, methods, techniques, know-how, specifications, processes, analyses, and protocols used in Stoneville's U.S. branded cottonseed business (such as Monsanto's procedures for the inspection, sampling and delivery of cottonseed at production facilities, procedures for analyzing job safety and complying with environmental regulations, and specifications for production-related data entry), and (ii) Monsanto's low acid delinting process.

(3) All assignable licenses, permits, and authorizations issued by any governmental organization relating to the Stoneville U.S. branded cottonseed business.

(4) All contracts to which Stoneville Pedigreed Seed Company is a party, including supply and distribution agreements.

(5) All other intangible and contractual rights used exclusively or primarily in Stoneville's U.S. branded cottonseed business not otherwise specifically addressed in b.(1)-(4).

4. Exclusions:

Excluded from the assets to be divested that are listed in this Schedule A are: (1) real property not specifically identified in Schedule A.2., and (2) software owned by or licensed to Defendant Monsanto (except that Stoneville will receive a non-exclusive license to TaqPro), and hardware used exclusively to access such software.

7

## SCHEDULE B – ENHANCED STONEVILLE ASSETS

1. Stoneville: As defined in the Final Judgment.

2. DPL Germplasm:  Defendants shall divest all interests in the DPL varieties listed in Table B, including, for each variety, any Plant Variety Protection Act certificates applied for or granted, patents applied for or granted, copies of all performance and other test results, phenotypic data, product descriptions, research data and DPL Marker Data.

   a.  With respect to this DPL Germplasm, Defendant Monsanto may:

   (1)  continue to sell during 2007 any existing inventories of these DPL varieties that Defendant DPL currently offers for sale in the United States;

   (2)  take back an exclusive license to commercialize varieties that (i) contain only traits out-licensed by Defendant Monsanto, and (ii) are essentially derived from these DPL varieties, or are essentially derived from a cross between any of these DPL varieties, which license may require the Acquirer of the Enhanced Stoneville Assets to seek U.S. patents for the DPL varieties listed in Table B, and may provide for enforcement of Monsanto's exclusive rights with respect to these varieties;

   (3)  retain exclusive rights (i) to continue to sell these DPL varieties in countries outside the United States in which Defendant DPL currently offers the varieties for sale, but such rights shall terminate with respect to a particular country and variety if Defendant Monsanto discontinues sales of that variety in that country, and (ii) to sell 05X460, 05Y063, and 05Z629 outside of the United States;

   (4)  retain sufficient quantities of cottonseed to enable it to continue its current sales of seed relating to sales made pursuant to subparagraph 3 above (provided that any such retention by Defendant Monsanto shall only be permitted to the extent it does not adversely affect the Acquirer of the Enhanced Stoneville Assets);

   (5)  retain sufficient quantities of cottonseed for Breeding purposes (provided that any such retention by Defendant Monsanto shall only be permitted to the extent it does not adversely affect the Acquirer of the Enhanced Stoneville Assets), and take back a non-exclusive license to use these DPL varieties in its Breeding program;

   (6)  take back a license that grants Defendant Monsanto only those rights

necessary to accomplish the divestiture of the VipCot Assets described in Schedule C; and

(7) require the Acquirer of the Enhanced Stoneville Assets to agree that for seven (7) years after the divestiture of the Enhanced Stoneville Assets it shall not commercialize a variety that is essentially derived from one of the DPL varieties listed in Table B, if that variety contains a Monsanto glyphosate tolerance trait, a Monsanto insect resistance trait, and any non-glyphosate herbicide tolerance trait commercialized in cottonseed in the United States as of the date of the filing of this Final Judgment.

b.  Defendants' divestiture of the DPL varieties 00W12, 02T15, 02Z55, 03Y047, 03Y056, 03Y062, 04T048, 04W019, 04Y341, 05X460, 05Y063, 05Z629, 25105N, and DP491 to the Acquirer of the Enhanced Stoneville Assets is subject to the license to Syngenta described in Schedule C.2.

3.  Syngenta Germplasm: Defendants shall divest all interests in the conventional Germplasm originating from the United States cotton Breeding program purchased by Defendant DPL from Syngenta pursuant to an agreement dated May 15, 2006, along with any conventional progeny of that material.

4.  Advanced Exotic Yield Lines:  Defendants shall divest exclusive rights to commercialize, and non-exclusive rights to Breed with, the Advanced Exotic Yield Lines set forth in Schedule D, including the right, subject to reasonable indemnification requirements, to create Null Lines (other than a Null Line that contains only one of the B.t. Genes of Bollgard II).  In connection with this divestiture:

a.  Defendants shall divest copies of all performance and other test results, phenotypic data, product descriptions, research data and Fingerprint information for those populations and Lines, excluding data regarding the presence or function of any genetic material from *Gossypium barbadense* present in the Lines.

b.  Defendants may not assert against the Acquirer of the Enhanced Stoneville Assets any rights Defendants may have or acquire with respect to (1) the Germplasm used in the Advanced Exotic Yield Lines, and (2) any non-transgenic yield trait contained in those Lines.

c.  Defendants may retain research quantities of the Advanced Exotic Yield Lines to enable them to continue their trait development research (provided that any such retention by Defendant Monsanto shall only be permitted to the extent it does not adversely affect the Acquirer of the Enhanced Stoneville Assets); and

9

d. Defendants may (1) prohibit the Acquirer of the Enhanced Stoneville Assets from conveying Lines from the Advanced Exotic Yield Lines or their progeny to third parties, other than for contract production work or for distribution to growers as commercial seed, and (2) require the Acquirer of the Enhanced Stoneville Assets to seek U.S. patents and enforce Breeding and resale restrictions on any varieties that are commercialized from the Advanced Exotic Yield Lines. Defendants shall lose the ability to require these terms (4.d.1 & 2) if Defendants have not licensed to a third party a non-transgenic cotton yield trait contained in one or more of the Advanced Exotic Yield Lines within five (5) years of the date of this Final Judgment.

5. <u>MAB Populations</u>: Defendants shall divest the MAB Populations set forth in Schedule E, including copies of all performance and other test results, phenotypic data, product descriptions, research data and Fingerprint information, and the right, subject to reasonable indemnification requirements, to create Null Lines (other than a Null Line that contains only one of the B.t. genes of Bollgard II).

6. <u>Cotton States Germplasm</u>: Defendant Monsanto shall grant the Acquirer of the Enhanced Stoneville Assets a non-exclusive, royalty-free license to sell under the Stoneville and NexGen brand names and Breed with the four (4) Cotton States varieties currently being sold by Stoneville. Defendant Monsanto shall relinquish evaluation rights to the Acquirer of the Enhanced Stoneville Assets for material comprised of Germplasm from pre-existing Breeding crosses between Cotton States' in-licensed Lines and any Lines being transferred exclusively to Stoneville pursuant to this Final Judgment.

a. In connection with its divestiture of this Cotton States Germplasm, Defendant Monsanto may retain exclusive rights to Germplasm already in-licensed to or commercialized through Cotton States at the date of this Final Judgment, or Germplasm from pre-existing Breeding crosses between two Cotton States' in-licensed Lines or between one of those Lines and a public variety, except that Defendant Monsanto may only retain non-exclusive rights to the Stoneville variety designated STX0502 which has been commercialized solely through Cotton States. Defendant Monsanto may only commercialize the Stoneville variety designated STX0502 to licensees other than Defendant DPL.

7. <u>Other Monsanto Germplasm</u>: Defendants shall divest all cotton Germplasm in the United States held by Defendant Monsanto prior to its acquisition of Defendant DPL and not otherwise addressed in Schedules A and B, subject to the following exceptions:

a. Any Publicly Available Cotton Germplasm, provided that if the Acquirer of the Enhanced Stoneville Assets does not otherwise possess the Germplasm and cannot otherwise reasonably obtain it, Defendant Monsanto must, if the Acquirer of the

10

Enhanced Stoneville Assets requests, provide the Acquirer of the Enhanced Stoneville Assets with sufficient quantities for use in a Breeding program;

b. Exclusive rights to (1) the Donor Lines for Defendant Monsanto's commercialized transgenic traits, (2) Germplasm Transformed or Introgressed with cotton transgenic traits other than Monsanto's Cotton Traits, (3) any Germplasm containing experimental transgenic events, and (4) Germplasm used in Monsanto's non-transgenic trait research and development program, with the exception of the Advanced Exotic Yield Lines, as addressed above; and

c. Rights to any third party Germplasm held in connection with the provision of trait Introgression services to third parties.

8. <u>Monsanto Marker Library</u>: Defendants shall provide access to the information in, and a non-exclusive, royalty-free license to use, Monsanto's Marker Library.

9. <u>Licenses</u>: Defendants shall grant licenses to the Acquirer of the Enhanced Stoneville Assets to develop, produce, have produced, and sell under the Stoneville and NexGen brands cottonseed containing Monsanto's Cotton Traits for use in the United States. Such licenses shall be based on commercially reasonable terms, and in particular shall provide that the licensee:

a. Shall be entitled to a proportion of the net license revenue for those traits at least as great as the net license revenue Defendant DPL is entitled to under its current licenses for those traits;

b. May, subject to reasonable regulatory and stewardship conditions, Breed into and sell cottonseed containing Monsanto Cotton Traits, non-Monsanto genes not naturally occurring in cotton;

c. Shall have an option to license future Monsanto B.t. Genes on the same terms as those used in the current DPL licenses. Defendants may terminate this option at such time as the Acquirer of the Enhanced Stoneville Assets' total annual sales of cottonseed containing a non-Monsanto B.t. Gene being marketed by the Acquirer of the Enhanced Stoneville Assets as conferring lepidopteran resistance under the Stoneville and NexGen brands, exceed 60% of the Acquirer of the Enhanced Stoneville Assets' annual sales of cottonseed that is marketed as lepidopteran resistant under the Stoneville and NexGen brands; and

d. Shall have an option to license future Monsanto Roundup Ready Genes on the same terms as those used in the current DPL licenses. Defendants may terminate this option at such time as the Acquirer of the Enhanced Stoneville Assets' total annual sales of

11

cottonseed containing a non-Monsanto glyphosate tolerance gene being marketed by the Acquirer of the Enhanced Stoneville Assets as conferring glyphosate tolerance under the Stoneville and NexGen brands, exceed 60% of the Acquirer of the Enhanced Stoneville Assets' annual sales of cottonseed that is marketed as glyphosate tolerant under the Stoneville and NexGen brands.  Defendants need not grant an option to any non-glyphosate herbicide tolerance trait stacked with any such glyphosate tolerance gene.

Table B – DPL Germplasm

| | |
|---|---|
| 00W12 (DP393) | 05Y063 |
| 02T15 | 05Z629 |
| 02Z55 | Delta Pearl |
| 03Y047 | DP 5690 |
| 03Y056 | DP 491 |
| 03Y062 | DP2156 |
| 04T048 | DP565 |
| 04W019 | DP5305 |
| 04Y341 | DP5415 |
| 05X460 | AZ2099 |

## SCHEDULE C – THE VIPCOT ASSETS

1.  All DPL Germplasm identified in Table C containing only a Syngenta trait; and, provided that Syngenta has obtained a license (identified in Section C.4. below) to the Roundup Ready Flex trait, all DPL Germplasm Lines identified in Table C containing a Syngenta trait and the Roundup Ready Flex trait.  The Germplasm Lines identified in Table C shall be conveyed along with:

> a.  Exclusive rights to commercialize varieties developed from the traited DPL Germplasm Lines identified in Table C, provided that any varieties commercialized from this Germplasm include, in addition to any other traits, the Cry67B event, Cry69D event, Cry02A event, or the Cot102 event;

> b.  Exclusive rights to Breed with the traited DPL Germplasm Lines identified in Table C, provided that any varieties commercialized from such Breeding include, in addition to any other traits, either the Cry67B event, Cry69D event, Cry02A event, or the Cot102 event;

> c.  Reports that provide all performance and other test results, phenotypic data, product descriptions, purity information, breeding histories, pedigrees and statuses for the Germplasm that is conveyed;

> d.  At Syngenta's request, Fingerprint information regarding the Recurrent Parents of each of the DPL Germplasm Lines listed in Table C sufficient to allow Syngenta to reasonably perform Backcrossing with this Germplasm (subject to reasonable compensation from Syngenta for such services), if Syngenta does not possess, cannot reasonably develop itself or contract for, the capability to develop this Fingerprint information; and

> e.  An exclusive license to commercialize varieties that contain the Cry67B event, Cry69D event, Cry02A event, or Cot102 event that are essentially derived from the Recurrent Parent Lines identified in Table C that are not otherwise being divested pursuant to Schedule B, which license shall require Monsanto to seek U.S. patents for those Recurrent Parent Lines and provide for enforcement of Syngenta's exclusive rights with respect to those lines.

2.  Breeding quantities of the Recurrent Parents of each of the DPL Germplasm Lines identified in Table C, subject to a license to Syngenta (a) permitting use of the Recurrent Parents only for crossing or Backcrossing between a Line and its relevant Recurrent Parent; (b) requiring that the Recurrent Parent Germplasm be returned or destroyed no later than December 31, 2014; and (c) prohibiting transfer of the Recurrent Parent Germplasm to any third party other than with an exclusive license to the relevant Line derived from that Recurrent Parent, with the same limitations on use of the Recurrent Parent Germplasm.

13

3. A non-exclusive royalty-free license to a PCR assay and/or an ELISA assay to enable detection of Monsanto's Roundup Ready Flex trait.

4. A non-exclusive license to (a) develop, produce, and sell cottonseed containing the Roundup Ready Flex trait under the standard commercial terms offered by Defendant Monsanto, including changes required by this Decree to the standard license, and (b) transfer such cottonseed to a third party with a commercial Roundup Ready Flex license.

5. Defendant DPL's interest in Germplasm populations Introgressed with the Cry67B event, Cry69D event, Cry02A event, and/or the Cot102 in the U.S. cotton Breeding program that Defendant DPL purchased from Syngenta pursuant to an agreement dated May 15, 2006, along with any progeny of that material.

6. Defendant Monsanto may condition the divestitures on Syngenta's acknowledgment that Defendant Monsanto is not conveying to Syngenta any rights not held by Defendant DPL prior to Defendant Monsanto's acquisition of Defendant DPL.

7. Defendants acknowledge that nothing in this Final Judgment relating to the divestiture of the VipCot Assets shall, in and of itself, modify, alter, terminate or otherwise affect any rights and obligations in any contract between Syngenta and either of the Defendants in effect as of the date of the filing of the Complaint in this matter.

14

## TABLE C – VipCot Germplasm
### (V1 = Cot102; C1 = Cry67B; C2 = Cry69D, C3 =Cry02A; RF = Roundup Ready Flex)

| Recurrent Parent | V1C1 RF | V1C1 | C1 | V1 | C1RF | V1RF | C2 | C3 | C2V1RF | C3V1 RF | C2V1 | C3V1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00H29 | X | | X | | | | X | X | X | X | | |
| 00S07 | | X | X | X | X | | X | X | | | | |
| 00W12 | X | X | X | X | | X | X | X | X | X | X | |
| 01W34 | | X | | X | | X | | | | | | |
| 02T15 | | X | X | X | | | X | X | | | X | X |
| 02Z55 | | X | X | X | | X | X | X | | | | |
| 02Z89 | | X | | | | | | | | | | |
| 03H070 | | X | X | X | | | X | X | | | | |
| 03Q066 | | X | X | X | | | X | X | | | | |
| 03Y047 | | X | X | X | | | X | X | | | | |
| 03Y056 | | X | X | X | X | | X | X | | | | |
| 03Y062 | | X | X | X | | | X | X | | | | |
| 04P011 | | X | | X | | | | | | | | |
| 04P024 | | X | | X | | | | | | | | |
| 04Q035 | | X | | X | | | | | | | | |
| 04T042 | | X | | X | | | | | | | | |
| 04T048 | | X | X | X | | | X | X | | | | |
| 04T056 | | X | | X | | | | | | | | |
| 04T067 | | X | | X | | | | | | | | |
| 04V073 | | X | X | X | X | | X | X | | | | |
| 04W019 | | X | X | X | | | X | X | | | X | |
| 04Y288 | | X | | X | | | | | | | X | |
| 04Y341 | | X | X | X | X | | X | X | | | | |
| 04Z007 | | X | | | | | | | | | | |
| 04Z353 | | X | | X | | | | | | | | |
| 05H210 | | X | | | | | | | | | | |
| 05H229 | | X | | X | | | | | | | | |
| 05H270 | | X | | X | | | | | | | | |
| 05H284 | | X | X | X | | | X | X | | | | |
| 05Q153 | | X | X | | | | X | X | | | | |
| 05T103 | | X | | X | | | | | | | | |
| 05V341 | | X | | X | | | | | | | | |
| 05X460 | | X | X | X | | | X | X | | | | |
| 05Y063 | | X | | | | | | | | | | |
| 05Y067 | | X | | | | | | | | | | |
| 05Y070 | | X | | | | | | | | | | |
| 05Z629 | | X | X | X | | | X | X | | | | |
| 05Z855 | | X | | X | | | | | | | | |
| 25105N | | X | X | | | | | | | | | |
| DP491 | X | | X | X | X | X | X | X | X | X | X | X |
| DP6207 | | X | X | | | | X | X | | | | |
| SG747 | | X | X | X | | | X | X | | | X | X |
| UA-4 | | X | | | | | | | | | | |

15

## SCHEDULE D – ADVANCED EXOTIC YIELD LINES
**(The Lines identified by the following serial numbers or variety name in Defendant Monsanto's Breeding database)**

| | | |
|---|---|---|
| MCS0719B2RF | 60066403610 | 60066410398 |
| MSC0720B2RF | 60066403634 | 60066410475 |
| MCS0721B2RF | 60066404080 | 60066410502 |
| MCS0722B2RF | 60066404181 | 60066410552 |
| MCS0723B2RF | 60066404294 | 60066410588 |
| MCS0724B2RF | 60066404395 | 60066411326 |
| MCS0725B2RF | 60066404434 | 60066411883 |
| MCS0726B2RF | 60066404446 | 60066412001 |
| MCS0727B2RF | 60066404559 | 60066412164 |
| MCS0728B2RF | 60066404840 | 60066412380 |
| MCS0729RF | 60066405082 | 60066414586 |
| MCS0730RF | 60066404207 | 60066414649 |
| MCS0731RF | 60066405676 | 60066406666 |
| MCS0732RF | 60066405703 | 60066406767 |
| MCS0733RF | 60066406399 | 60066407644 |
| MCS0734RF | 60066406515 | 60066416821 |
| MCS0735RF | 60066407442 | 60066409686 |
| MCS0736RF | 60066415021 | 60066409701 |
| MCS0737RF | 60066415122 | 60066410146 |
| MCS0738RF | 60066415285 | 60067807314 |
| MCS0739RF | 60066407846 | 60067807720 |
| MCS0740RF | 60066416124 | 60067808924 |
| 60066412443 | 60066408519 | 60067809433 |
| 60066412455 | 60066408608 | 60067809774 |
| 60066412532 | 60066408747 | 60067810082 |
| 60066412683 | 60066409129 | 60067810208 |
| 60066412859 | 60066409131 | 60067810347 |
| 60066403254 | 60066409220 | 60067810501 |
| 60066403367 | 60066409585 | 60067811325 |
| 60066403418 | 60066410350 | 60067811642 |
| 60067812303 | I0000000218956694327000 | I0000000218965148471000 |
| 60067812620 | I0000000218957022007000 | I0000000218965214007000 |
| 60067813494 | I0000000218957085430000 | I0000000218965476151000 |
| 60067813646 | I0000000218957349687000 | I0000000218965803831000 |
| 60067814903 | I0000000218957546295000 | I0000000218965934903000 |
| 60067815638 | I0000000218957611831000 | I0000000218966131511000 |
| 60067815791 | I0000000218958070583000 | I0000000218966459191000 |
| 60067816147 | I0000000218958136119000 | I0000000218966524727000 |
| 60067817050 | I0000000218958660407000 | I0000000218966983479000 |
| 60067818115 | I0000000218958725943000 | I0000000218967835447000 |
| 60067818571 | I0000000218959119159000 | I0000000218967900983000 |
| 60067819193 | I0000000218959315767000 | I0000000218968097591000 |

16

| | | |
|---|---|---|
| 60067806259 | I00000002189597745190000 | I00000002189682286630000 |
| 60067806297 | I00000002189598400550000 | I00000002189682286630000 |
| 60067809534 | I00000002189600366630000 | I00000002189683597350000 |
| 60067809661 | I00000002189601677350000 | I00000002189684908070000 |
| 60067810676 | I00000002189604954150000 | I00000002189686874150000 |
| 60067810878 | I00000002189608230950000 | I00000002189696704550000 |
| 60067810979 | I00000002189614784550000 | I00000002189699325990000 |
| 60067810993 | I00000002189615439910000 | I00000002189700636710000 |
| 60067811185 | I00000002189616095270000 | I00000002189709811750000 |
| 60067813228 | I00000002189618716710000 | I00000002189712433190000 |
| 60067813444 | I00000002189620682790000 | I00000002189714399270000 |
| 60067814268 | I00000002189621338150000 | I00000002189717020710000 |
| 60067815296 | I00000002189623959590000 | I00000002189718986790000 |
| 60067815981 | I00000002189624614950000 | I00000002189719642150000 |
| 60067816058 | I00000002189629857830000 | I00000002189720297510000 |
| 60067816692 | I00000002189631168550000 | I00000002189722263590000 |
| 60067818711 | I00000002189637722150000 | I00000002189725540390000 |
| 60067819371 | I00000002189638377510000 | I00000002189726195750000 |
| I00000002189562355750000 | I00000002189642309670000 | I00000002189730783270000 |
| I00000002189564321830000 | I00000002189649518630000 | I00000002189731438630000 |
| I00000002189734715430000 | I00000002189819912230000 | I00000002189914939430000 |
| I00000002189736681510000 | I00000002189825155110000 | I00000002189916905510000 |
| I00000002189738647590000 | I00000002189829087270000 | I00000002189917560870000 |
| I00000002189739958310000 | I00000002189834330150000 | I00000002189923459110000 |
| I00000002189748477990000 | I00000002189836951590000 | I00000002189926080550000 |
| I00000002189751099430000 | I00000002189837606950000 | I00000002189930012710000 |
| I00000002189753720870000 | I00000002189839573030000 | I00000002189932634150000 |
| I00000002189757653030000 | I00000002189843505190000 | I00000002189935910950000 |
| I00000002189758963750000 | I00000002189844815910000 | I00000002189936566310000 |
| I00000002189766172710000 | I00000002189847437350000 | I00000002189938532390000 |
| I00000002189769449510000 | I00000002189853335590000 | I00000002189943119910000 |
| I00000002189772070950000 | I00000002189853990950000 | I00000002189945085990000 |
| I00000002189777338167000 | I00000002189855957630000 | I00000002189947707430000 |
| I00000002189776003110000 | I00000002189857267750000 | I00000002189949018150000 |
| I00000002189778624550000 | I00000002189862510630000 | I00000002189952294950000 |
| I00000002189781901350000 | I00000002189865132070000 | I00000002189954261030000 |
| I00000002189784522790000 | I00000002189867098150000 | I00000002189958848550000 |
| I00000002189787144230000 | I00000002189870374950000 | I00000002189960159270000 |
| I00000002189790421030000 | I00000002189876273190000 | I00000002189962780710000 |
| I00000002189792387110000 | I00000002189876928550000 | I00000002189970645030000 |
| I00000002189794353190000 | I00000002189880860710000 | I00000002189976543270000 |
| I00000002189798285350000 | I00000002189885448230000 | I00000002189979820070000 |
| I00000002189798940710000 | I00000002189887414310000 | I00000002189983752230000 |
| I00000002189800251430000 | I00000002189888725030000 | I00000002190001446950000 |
| I00000002189801562150000 | I00000002189891346470000 | I00000002190005379110000 |
| I00000002189803528230000 | I00000002189894623270000 | I00000002190009311270000 |

| | | |
|---|---|---|
| I00000002189805494310000 | I00000002189897244710000 | I00000002190015209510000 |
| I00000002189806149670000 | I00000002189897900070000 | I00000002190019141670000 |
| I00000002189808771110000 | I00000002189892107900000 | I00000002190020452390000 |
| I00000002189812047910000 | I00000002189901176870000 | I00000002190021763110000 |
| I00000002189815980070000 | I00000002189912973350000 | I00000002190027661350000 |
| I00000002189816635430000 | I00000002189914284070000 | I00000002190029627430000 |
| I00000002190036683630000 | I00000002190144970790000 | I00000002190264246310000 |
| I00000002190038147110000 | I00000002190150213670000 | I00000002190268178470000 |
| I00000002190038802470000 | I00000002190150869030000 | I00000002190268833830000 |
| I00000002190040113190000 | I00000002190152835110000 | I00000002190270144550000 |
| I00000002190048632870000 | I00000002190161354790000 | I00000002190275387430000 |
| I00000002190054531110000 | I00000002190162010150000 | I00000002190276042790000 |
| I00000002190055841830000 | I00000002190167908390000 | I00000002190277353510000 |
| I00000002190059773990000 | I00000002190171840550000 | I00000002190279974950000 |
| I00000002190061084710000 | I00000002190175117350000 | I00000002190281285670000 |
| I00000002190065672230000 | I00000002190177738790000 | I00000002190286528550000 |
| I00000002190066327590000 | I00000002190181670950000 | I00000002190293082150000 |
| I00000002190075502630000 | I00000002190187569190000 | I00000002190298325030000 |
| I00000002190076157990000 | I00000002190190190630000 | I00000002190298980390000 |
| I00000002190082056230000 | I00000002190192156710000 | I00000002190302912550000 |
| I00000002190086643750000 | I00000002190192812070000 | I00000002190304223270000 |
| I00000002190089920550000 | I00000002190193467430000 | I00000002190308155430000 |
| I00000002190091886630000 | I00000002190196088860000 | I00000002190312087590000 |
| I00000002190097129510000 | I00000002190196744230000 | I00000002190316675110000 |
| I00000002190099750950000 | I00000002190212472870000 | I00000002190319296550000 |
| I00000002190101717030000 | I00000002190213128230000 | I00000002190320607270000 |
| I00000002190104993830000 | I00000002190215749670000 | I00000002190325194790000 |
| I00000002190110236710000 | I00000002190220337190000 | I00000002190327816230000 |
| I00000002190110892070000 | I00000002190223613990000 | I00000002190328471590000 |
| I00000002190113513510000 | I00000002190225580070000 | I00000002190330437670000 |
| I00000002190115479590000 | I00000002190232789030000 | I00000002190331093030000 |
| I00000002190118101030000 | I00000002190234099750000 | I00000002190336991270000 |
| I00000002190123343910000 | I00000002190238687270000 | I00000002190338301990000 |
| I00000002190123999270000 | I00000002190239979990000 | I00000002190339612710000 |
| I00000002190127276070000 | I00000002190245896230000 | I00000002190340268070000 |
| I00000002190127931430000 | I00000002190247206950000 | I00000002190345793190000 |
| I00000002190133174310000 | I00000002190256381990000 | I00000002190366482470000 |
| I00000002190137106470000 | I00000002190257692710000 | I00000002190367779310000 |
| I00000002190371069990000 | I00000002190460198950000 | I00000002190547361830000 |
| I00000002190377623590000 | I00000002190463477550000 | I00000002190548017190000 |
| I00000002190378278950000 | I00000002190470029350000 | I00000002190553915430000 |
| I00000002190380900390000 | I00000002190471340070000 | I00000002190557847590000 |
| I00000002190384832550000 | I00000002190471995430000 | I00000002190561779750000 |
| I00000002190385487910000 | I00000002190474616870000 | I00000002190563090470000 |
| I00000002190387453990000 | I00000002190478549030000 | I00000002190565711910000 |
| I00000002190388109350000 | I00000002190481825830000 | I00000002190567022630000 |

| | | |
|---|---|---|
| I000000002190393352230000 | I000000002190482481190000 | I000000002190570954790000 |
| I000000002190394007590000 | I000000002190486413350000 | I000000002190571610150000 |
| I000000002190396629030000 | I000000002190489690150000 | I000000002190576853030000 |
| I000000002190398595110000 | I000000002190491656230000 | I000000002190582095910000 |
| I000000002190399905830000 | I000000002190493622310000 | I000000002190582751270000 |
| I000000002190401871910000 | I000000002190494933030000 | I000000002190583406630000 |
| I000000002190403182630000 | I000000002190500175910000 | I000000002190584061990000 |
| I000000002190406459430000 | I000000002190501486630000 | I000000002190584717350000 |
| I000000002190407114790000 | I000000002190503452710000 | I000000002190592581670000 |
| I000000002190409080870000 | I000000002190508040230000 | I000000002190593892390000 |
| I000000002190411702310000 | I000000002190511317030000 | I000000002190597824550000 |
| I000000002190414979110000 | I000000002190513283110000 | I000000002190598479910000 |
| I000000002190415634470000 | I000000002190514593830000 | I000000002190602412070000 |
| I000000002190422188070000 | I000000002190520492070000 | I000000002190603067430000 |
| I000000002190431363110000 | I000000002190522458150000 | I000000002190603722790000 |
| I000000002190432673830000 | I000000002190523768870000 | I000000002190612242470000 |
| I000000002190433329190000 | I000000002190524424230000 | I000000002190620106790000 |
| I000000002190433984550000 | I000000002190525079590000 | I000000002190620762150000 |
| I000000002190435950630000 | I000000002190527045670000 | I000000002190622072870000 |
| I000000002190439882790000 | I000000002190533592700000 | I000000002190623383590000 |
| I000000002190449713190000 | I000000002190536220710000 | I000000002190627315750000 |
| I000000002190451023910000 | I000000002190538186790000 | I000000002190627971110000 |
| I000000002190454300710000 | I000000002190540152870000 | I000000002190629281830000 |
| I000000002190455611430000 | I000000002190545395750000 | I000000002190631903270000 |
| I000000002190633213990000 | I000000002190717755430000 | I000000002190801641510000 |
| I000000002190637146150000 | I000000002190719721510000 | I000000002190802952230000 |
| I000000002190638456870000 | I000000002190725619750000 | I000000002190804262950000 |
| I000000002190643044390000 | I000000002190726275110000 | I000000002190805573670000 |
| I000000002190646976550000 | I000000002190728241190000 | I000000002190812782630000 |
| I000000002190649597990000 | I000000002190729551910000 | I000000002190818680870000 |
| I000000002190650253350000 | I000000002190730862630000 | I000000002190821957670000 |
| I000000002190653530150000 | I000000002190734139430000 | I000000002190823268390000 |
| I000000002190654185510000 | I000000002190734794790000 | I000000002190823923750000 |
| I000000002190654840870000 | I000000002190740037670000 | I000000002190824579110000 |
| I000000002190655496230000 | I000000002190744625190000 | I000000002190825234470000 |
| I000000002190656151590000 | I000000002190745935910000 | I000000002190826545190000 |
| I000000002190656806950000 | I000000002190747901990000 | I000000002190829821990000 |
| I000000002190658773030000 | I000000002190749868070000 | I000000002190833098790000 |
| I000000002190659428390000 | I000000002190751178790000 | I000000002190837686310000 |
| I000000002190664015910000 | I000000002190752489510000 | I000000002190840963110000 |
| I000000002190665326630000 | I000000002190757077030000 | I000000002190841618470000 |
| I000000002190670569510000 | I000000002190759043110000 | I000000002190847516710000 |
| I000000002190675157030000 | I000000002190761009190000 | I000000002190848172070000 |
| I000000002190676467750000 | I000000002190762319910000 | I000000002190849482790000 |
| I000000002190677778470000 | I000000002190763630630000 | I000000002190854070310000 |
| I000000002190678433830000 | I000000002190764285990000 | I000000002190854725670000 |

| | | |
|---|---|---|
| I00000002190679089190000 | I00000002190764941350000 | I00000002190856036390000 |
| I00000002190681055270000 | I00000002190769528870000 | I00000002190856691750000 |
| I00000002190682365990000 | I00000002190774116390000 | I00000002190858002470000 |
| I00000002190688264230000 | I00000002190780669990000 | I00000002190859313190000 |
| I00000002190689574950000 | I00000002190782636070000 | I00000002190859968550000 |
| I00000002190696128550000 | I00000002190785257510000 | I00000002190861279270000 |
| I00000002190700716070000 | I00000002190789189670000 | I00000002190861934630000 |
| I00000002190703992870000 | I00000002190789845030000 | I00000002190865866790000 |
| I00000002190706614310000 | I00000002190793777190000 | I00000002190866522150000 |
| I00000002190712512550000 | I00000002190798364710000 | I00000002190867177510000 |
| I00000002190871109670000 | I00000002190909775910000 | I00000002190954340390000 |
| I00000002190871765030000 | I00000002190913052710000 | I00000002190959583270000 |
| I00000002190873075750000 | I00000002190914363430000 | I00000002190963515430000 |
| I00000002190873731110000 | I00000002190915674150000 | I00000002190966136870000 |
| I00000002190876352550000 | I00000002190917640230000 | I00000002190966792230000 |
| I00000002190877007910000 | I00000002190920917030000 | I00000002190973345830000 |
| I00000002190878318630000 | I00000002190922883110000 | I00000002190975967270000 |
| I00000002190878973990000 | I00000002190923538470000 | I00000002190978588710000 |
| I00000002190880284710000 | I00000002190926815270000 | I00000002190981865510000 |
| I00000002190884216870000 | I00000002190929436710000 | I00000002190982520870000 |
| I00000002190884872230000 | I00000002190932713510000 | I00000002190985142310000 |
| I00000002190887493670000 | I00000002190933368770000 | ICA00000000334736778898 9 |
| I00000002190888804390000 | I00000002190934679590000 | ICA00000000334747310534 1 |
| I00000002190903877670000 | I00000002190937301030000 | ICA00000000334768327929 3 |
| I00000002190905843750000 | I00000002190945165350000 | ICA00000000334810316844 5 |
| I00000002190909120550000 | I00000002190953029670000 | P000000000000123710341565 |
| P000000000000123713880509 | P000000000000123714666941 | P000000000000123714994621 |
| P000000000000123717091773 | P000000000000123717419453 | P000000000000123717943741 |
| P000000000000123718795709 | P000000000000123720630717 | P000000000000123722662333 |
| P000000000000123724497341 | P000000000000123726856637 | P000000000000123727184317 |
| 60044433150 | 60035225831 | 60035225879 |
| 60035225881 | 60035225906 | 60035225920 |
| 60043573686 | | |

## SCHEDULE E – MAB POPULATIONS
(The Lines identified by the following code numbers in Defendant Monsanto's Breeding database)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| L0001 | L0025 | L0049 | L0235 | L0271 | L0310 | L0334 | L0357 | L0380 | L0404 |
| L0002 | L0027 | L0050 | L0236 | L0282 | L0311 | L0335 | L0358 | L0381 | L0406 |
| L0003 | L0028 | L0051 | L0237 | L0283 | L0312 | L0336 | L0359 | L0382 | L0407 |
| L0004 | L0029 | L0052 | L0238 | L0284 | L0313 | L0337 | L0360 | L0383 | L0408 |
| L0005 | L0030 | L0053 | L0239 | L0290 | L0314 | L0338 | L0361 | L0384 | L0409 |
| L0006 | L0031 | L0054 | L0240 | L0291 | L0315 | L0339 | L0362 | L0385 | L0410 |
| L0007 | L0032 | L0055 | L0241 | L0292 | L0317 | L0340 | L0363 | L0386 | L0411 |
| L0008 | L0033 | L0056 | L0242 | L0293 | L0318 | L0341 | L0364 | L0387 | L1002 |
| L0009 | L0034 | L0057 | L0243 | L0294 | L0319 | L0342 | L0365 | L0388 | L1003 |
| L0010 | L0035 | L0059 | L0244 | L0295 | L0320 | L0343 | L0366 | L0390 | L1004 |
| L0012 | L0036 | L0100 | L0245 | L0296 | L0321 | L0344 | L0367 | L0391 | L1005 |
| L0013 | L0037 | L0175 | L0246 | L0297 | L0322 | L0345 | L0368 | L0392 | L1008 |
| L0014 | L0038 | L0224 | L0247 | L0298 | L0323 | L0346 | L0369 | L0393 | L1009 |
| L0015 | L0039 | L0225 | L0248 | L0299 | L0324 | L0347 | L0370 | L0394 | |
| L0016 | L0040 | L0226 | L0249 | L0301 | L0325 | L0348 | L0371 | L0395 | |
| L0017 | L0041 | L0227 | L0250 | L0302 | L0326 | L0349 | L0372 | L0396 | |
| L0018 | L0042 | L0228 | L0251 | L0303 | L0327 | L0350 | L0373 | L0397 | |
| L0019 | L0043 | L0229 | L0252 | L0304 | L0328 | L0351 | L0374 | L0398 | |
| L0020 | L0044 | L0230 | L0253 | L0305 | L0329 | L0352 | L0375 | L0399 | |
| L0021 | L0045 | L0231 | L0254 | L0306 | L0330 | L0353 | L0376 | L0400 | |
| L0022 | L0046 | L0232 | L0255 | L0307 | L0331 | L0354 | L0377 | L0401 | |
| L0023 | L0047 | L0233 | L0256 | L0308 | L0332 | L0355 | L0378 | L0402 | |
| L0024 | L0048 | L0234 | L0257 | L0309 | L0333 | L0356 | L0379 | L0403 | |

## SCHEDULE F – DONOR LINES

MON 531 in Coker 312

MON 757 in any variety

MON 1445 in Coker 312

MON1698 in any variety

MON 15985 in DP50B or PS7

MON 88913 in Coker 130, PS7 or Suregro 125

MON15985 x MON 88913 in PS7 or Suregro 125

MON 1076 in any variety

MON 15947 in any variety

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | Civil Action No.: 1:07-cv-00992 |
| Plaintiff,  ) | Hon. Ricardo M. Urbina |
| ) | |
| v.  ) | |
| ) | |
| MONSANTO COMPANY and  ) | |
| DELTA AND PINE LAND COMPANY,  ) | |
| ) | |
| Defendants.  ) | |
| ) | |

## CERTIFICATE OF COMPLIANCE WITH PROVISIONS
## OF THE ANTITRUST PROCEDURES AND PENALTIES ACT

Plaintiff United States of America, by the undersigned attorneys, hereby certifies that, in

compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), the following

procedures have been followed in preparation for the entry of the Final Judgment in the above-

captioned matter:

1.  Plaintiff and defendants have stipulated to the entry of the proposed Final Judgment

in a stipulation filed with the Court on May 31, 2007 (the "Hold Separate and Preservation of

Assets Stipulation and Order" or "HSSO").

2.  The Complaint, Competitive Impact Statement ("CIS"), proposed Final Judgment

and HSSO were filed with the Court on May 31, 2007.

3.  The proposed Final Judgment and CIS were published in the *Federal Register* on

June 15, 2007. *See United States v. Monsanto Co. and Delta and Pine Land Co.,* 72 Fed. Reg.

33336-01, 2007 WL 1708314.

    4.    A summary of the terms of the proposed Final Judgment was published in the *Washington Post*, a newspaper of general circulation in the District of Columbia, for seven days beginning on June 28, 2007 and ending on July 4, 2007. (See Attachment.)

    5.    Copies of the proposed Final Judgment, Competitive Impact Statement and HSSO were furnished to all persons requesting them and made available on the Antitrust Division's Internet site.

    6.    The defendants have filed with the Court a description of written or oral communications by or on behalf of the defendants, or any other person, with any officer or employee of the United States concerning the proposed Final Judgment, as required by 15 U.S.C. § 16(g). Defendants filed their descriptions on June 11, 2007.

    7.    The sixty-day comment period prescribed by 15 U.S.C. §16(b) and (d) for the receipt and consideration of written comments, during which the proposed Final Judgment could not be entered, ended on August 27, 2007.

    8.    The United States received eleven comments on the proposed Final Judgment. The United States filed those comments and its Response to Public Comments with the Court on March 4, 2008, and published the Response and the comments in the Federal Register on April 4, 2007. *United States v. Monsanto Co. and Delta and Pine Land Co.*, 73 Fed. Reg. 18612-01, 2008 WL 892671.

9.  The parties have now satisfied all the requirements of the Antitrust Procedures and

Penalties Act, 15 U.S.C. § 16(b)-(h), as a condition for entering the proposed Final Judgment,

and it is now appropriate for the Court to make the necessary public interest determination

required by 15 U.S.C. § 16(e) and to enter the proposed Final Judgment.


Dated: April 15, 2008                                    Respectfully submitted,



                                         _____
                                         Jill A. Ptacek (WA Bar #18756)
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Antitrust Division
                                         Transportation, Energy &
                                             Agriculture Section
                                         325 7th Street, NW, Suite 500
                                         Washington, DC 20004
                                         Telephone: (202) 307-6607
                                         Facsimile: (202) 307-2784

Ad # 137930  Name US DEPT OF JUSTICE/ANTI TRUS    Size 84 lines          M0053
Class  815'   PO # DJJ07PHATR03 Authorized by MAURA LEE  Account 632270

### PROOF OF PUBLICATION

District of Columbia, ss., Personally appeared before me, a Notary Public in and for the
said District, Kate M. Davey well known to me to be Billing Manager
of The Washington Post, a daily newspaper published in the City of Washington,
District of Columbia, and making oath in due form of law that an advertisement containing
the language annexed hereto was published in said newspaper on the dates mentioned in the
certificate herein.

I Hereby Certify that the attached advertisement was published in
The Washington Post, a daily newspaper, upon the following dates at a cost of $5,298.64,
and was circulated in the Washington metropolitan area.

Published 7 times. Dates: June 28, 29 and 30, July 1, 2, 3 and 4, 2007
Account 632270

Witness my hand and official seal this _____ day of _____ 20__

My commission expires _____

Nicole Morton-McFadden
Notary Public District of Columbia
My Commission Expires 05-31-2011

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
UNITED STATES v. MONSANTO CO.
TAKE NOTICE that a proposed Final Judgment has been filed with the United
States District Court for the District of Columbia in a civil antitrust case,
United States v. Monsanto Co., Civ. Action No. 1:07CV00992. On May 31,
2007, the United States filed a Complaint alleging that the proposed
acquisition by Monsanto Company ( Monsanto ) of Delta and Pine Land
Company ( DPL ) would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.
The Complaint alleges that the acquisition would substantially reduce
competition for the development, breeding, and sale of traited cottonseed in
the MidSouth (Mississippi, Arkansas, Louisiana, Missouri, and Tennessee)
and Southeast (Alabama, Georgia, Florida, South Carolina, North Carolina,
and Virginia) United States. Specifically, the Complaint alleges that
Monsanto's acquisition of Delta and Pine Land would enhance Monsanto's
ability and incentive to raise traited cottonseed prices and eliminate Delta
and Pine Land as a partner independent of Monsanto for competing trait
developers. The proposed Final Judgment, also filed on May 31, 2007,
requires the parties to divest (1) Monsanto's Stoneville Pedigreed Seed
Company; (2) other Monsanto cotton breeding assets; (3) specified lines of
Delta and Pine Land cottonseed to the acquirer of the Stoneville assets; and
(4) specified lines of Delta and Pine Land cottonseed containing the VipCot
transgenic trait to Syngenta AG. It also requires Monsanto to modify certain
licenses. A Competitive Impact Statement filed by the United States
describes the Complaint, the proposed Final Judgment, the industry, and the
remedies available to private litigants who may have been injured by the
alleged violation. Copies of the Complaint, proposed Final Judgment, Hold
Separate and Preservation of Assets Stipulation and Order, and Competitive
Impact Statement are available for inspection at the Department of Justice,
Antitrust Division, 325 7th Street, N.W., Suite 215, Washington, D.C. 20530
(202-514-2481), on the Internet at http://www.usdoj.gov/atr, and at the
Office of the Clerk of the United States District Court for the District of
Columbia.
Interested parties may address comments to Donna N. Kooperstein, Chief,

2   Ad # 137930   Name US DEPT OF JUSTICE/ANTI TRUS     Size 84 lines                      M0054
    Class  815'   PO # DJJ07PHATR03 Authorized by MAURA LEE   Account 632270

Transportation, Energy & Agriculture Section, Antitrust Division, Department
of Justice, 325 7th Street, N.W., Suite 500, Washington, D.C. 20530
(202-307-6349), within sixty (60) days of the date of issuance.

**COMMERCIAL INVOICE and STATEMENT**

# The Washington Post
**washingtonpost.com**


| 1 | Billing Period | 2 | Advertiser/Client Name |
|---|---|---|---|
| | 07/01/07-07/31/07 | | US DEPT OF JUSTICE/ANTI TRUS |

| 23 | Total Amount Due | Amount Paid | 3 | Terms of Payment |
|---|---|---|---|---|
| | 18,424.32 | | | Payable On Or Before 15th Day After Billing. No Cash Discount |

| 4 Page | 5 Billing Date | 6 Agency Acct No. | 7 Advertiser/Client No. | 21 Current Net Amount | 22 30 Days | 60 Days | 90 Days | 120 Days |
|---|---|---|---|---|---|---|---|---|
| 1 | 07/31/07 | | 632270 | 9,589.92 | 8,834.40 | 0.00 | 0.00 | 0.00 |

| 8 | Billed Account and Address | 9 | Remittance Address |
|---|---|---|---|
| | US DEPT OF JUSTICE/ANTI TRUS<br>ATTN: MAURA LEE PETERSON<br>OFFICE OF OPERATIONS<br>950 PENNSYLVANIA AVE NW # 3335<br>WASHINGTON, DC 20530 | | THE WASHINGTON POST<br>P.O. BOX 79101<br>BALTIMORE, MD 21279-0101 |

0006322703200707000184243211111

- - - - - - - - - - - - - - - - - - - - - - (Detach here and return with remittance) - - - - - - - - - - - - - - - - - - - - -

| 10 Date | 11 Newspaper Reference | 12 13 14 | Description - Other Comments/Changes | 15 16 SAU Size/Billed Units | 17 18 Times Run Rate | 19 Gross Amt | 20 Net Amt |
|---|---|---|---|---|---|---|---|
| | | | BALANCE FORWARD | | | | 8,834.40 |
| | | | CLASSIFIED LIGHTFACE ADVERTISING | | | | |
| 07/18/2007 | S086451/A5382120<br>INV# 15138353 | | U.S. DEPARTMENT OF JUSTICE ANTIT/0815<br>AUTH: S. BROWN<br>P.O. C4170207213<br>LEGAL NOTICES ONLINE | DLY 2 @ 34 LI | 8.48 | 576.64<br>10.00 | 586.64 |
| 07/19/2007 | S086451/A5382120<br>INV# 15140271 | | U.S. DEPARTMENT OF JUSTICE ANTIT/0815<br>AUTH: S. BROWN<br>P.O. C4170207213 | DLY 2 @ 34 LI | 8.48 | 576.64 | 576.64 |
| 07/20/2007 | S086451/A5382120<br>INV# 15141835 | | U.S. DEPARTMENT OF JUSTICE ANTIT/0815<br>AUTH: S. BROWN<br>P.O. C4170207213 | DLY 2 @ 34 LI | 8.48 | 576.64 | 576.64 |
| 07/21/2007 | S086451/A5382120<br>INV# 15144718 | | U.S. DEPARTMENT OF JUSTICE ANTIT/0815<br>AUTH: S. BROWN<br>P.O. C4170207213 | DLY 2 @ 34 LI | 8.48 | 576.64 | 576.64 |
| 07/22/2007 | S086451/A5382120<br>INV# 15147807 | | U.S. DEPARTMENT OF JUSTICE ANTIT/0815<br>AUTH: S. BROWN<br>P.O. C4170207213 | SUN 2 @ 34 LI | 12.08 | 821.44 | 821.44 |

Statement of Account Aging of Past Due Amounts

| 21 Current Net Amount | 22 30 Days | 60 Days | 90 Days | 120 Days | 23 Total Amount Due |
|---|---|---|---|---|---|
| 9,589.92 | 8,834.40 | 0.00 | 0.00 | 0.00 | 18,424.32 |

# The Washington Post
**washingtonpost.com**

**1150 15th Street, NW Washington, DC 20071**
**Invoice Questions**
Tel: (202) 334-4875  Fax: (202) 334-4706  e-mail: CUSTACCT@WASHPOST.COM
Tearsheet request: TEARSHTS@WASHPOST.COM
Not subject to back-up Tax Withholding    Duns #: 3245768    Fed ID #: 53-0182885

| Advertiser Information | | | | | |
|---|---|---|---|---|---|
| 1 | Billing Period | 6 | Agency Account Number | 7 | Advertiser/Client Number | 2 | Advertiser/Client Name |
| | 07/01/07-07/31/07 | | | | 632270 | | US DEPT OF JUSTICE/ANTI TRUS |

**The Washington Post**

**washingtonpost.com**

**express**

| 4. Page | 1. Billing Period | 2. Advertiser/Client Name |
|---|---|---|
| 2 | 07/01/07-07/31/07 | US DEPT OF JUSTICE/ANTI TRUS |

| 6. Agency Account Number | 7. Advertiser/Client Number | 5. Billing Date. | 23. Total Amount Due |
|---|---|---|---|
| | 632270 | 07/31/07 | 18,424.32 |

| Address Change Request | Comments/Questions |
|---|---|
| | |
| | |
| | |
| | |
| | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 10. Date | 11. Newspaper Reference | 12 13 14. Description - Other Comments/Changes | 15 16. SAU Size Billed Units | 17. Times Run 18. Rate | 19. Gross Amt | 20. Net Amt |
|---|---|---|---|---|---|---|
| 07/23/2007 | S086451/A5382120 INV# 15152840 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: S. BROWN P.O. C4170207213 | DLY 2 @ 34 LI | 8.48 | 576.64 | 576.64 |
| 07/24/2007 | S086451/A5382120 INV# 15154220 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: S. BROWN P.O. C4170207213 | DLY 2 @ 34 LI | 8.48 | 576.64 | 576.64 |
| 06/28/2007 | S137930/A5355339 INV# 15091388 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 LEGAL NOTICES ONLINE | DLY 2 @ 42 LI | 8.48 | 712.32 10.00 | 722.32 |
| 06/29/2007 | S137930/A5355339 INV# 15093698 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | DLY 2 @ 42 LI | 8.48 | 712.32 | 712.32 |
| 06/30/2007 | S137930/A5355339 INV# 15096129 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | DLY 2 @ 42 LI | 8.48 | 712.32 | 712.32 |
| 07/01/2007 | S137930/A5355339 INV# 15103558 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | SUN 2 @ 42 LI | 12.08 | 1,014.72 | 1,014.72 |
| 07/02/2007 | S137930/A5355339 INV# 15105538 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | DLY 2 @ 42 LI | 8.48 | 712.32 | 712.32 |
| 07/03/2007 | S137930/A5355339 INV# 15106672 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | DLY 2 @ 42 LI | 8.48 | 712.32 | 712.32 |
| 07/04/2007 | S137930/A5355339 INV# 15107557 | U.S. DEPARTMENT OF JUSTICE ANTIT/0815 AUTH: MAURA LEE P.O. DJJ07PHATR03 | DLY 2 @ 42 LI | 8.48 | 712.32 | 712.32 |
| | | TOTAL CURRENT AD ACTIVITY | | | | 9,589.92 |
| | | TOTAL AMOUNT DUE | | | | 18,424.32 |

# The Washington Post

**washingtonpost.com**



| | Billing Period | | Advertiser/Client Name |
|---|---|---|---|
| 1 | 07/01/07-07/31/07 | 2 | US DEPT OF JUSTICE/ANTI TRUS |

| 4 | Page | 6 | Agency Account Number | 7 | Advertiser/Client Number | 5 | Billing Date | 23 | Total Amount Due |
|---|---|---|---|---|---|---|---|---|---|
| | 3 | | | | 632270 | | 07/31/07 | | 18,424.32 |

| 10 | Date | 11 | Newspaper Reference | 12 | 13 | 14 | Description - Other Comments/Changes | 15 16 | SAU Size Billed Units | 17 18 | Times Run Rate | 19 | Gross Amt | 20 | Net Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CURRENT PERIOD ACTIVITY SUMMARY | | | | | | | | | | | | |
| | | | CLASSIFIED | | | | 14.00 | | INSERTS | | 1,064.00 | | LINES | | |