*Leave to file first pages motion to file amicus brief and pages two through six as the amicus brief.*

*[signed] Ricardo M. Urbina 4/25/08*

April 16, 2008

Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Room 6006 Annex
Washington, DC  20001

**Organization for Competitive Markets**

Re:  *United States of America v. Monsanto Company and Delta and Pine Land Company*, Docket No. 07-CV-992

Dear Judge Urbina:

On May 31, 2007, plaintiff United States filed its complaint initiating the above-captioned case (the "Complaint") along with a Proposed Final Judgment, Hold Separate and Preservation of Assets Stipulation and Order, and a Competitive Impact Statement (collectively "the Consent Decree") concerning Monsanto Company's ("Monsanto") acquisition of Delta and Pine Land Company ("DPL").  Pursuant to 15 U.S.C. §16(b)-(h) (Antitrust Procedures and Penalties Act or Tunney Act), the Complaint, Proposed Final Judgment and Competitive Impact Statement were published in the Federal Register and notice of the Consent Decree was published in certain newspapers in order to solicit comments.

The United States Department of Justice ("DOJ") received comments opposing the merger from a number of organizations, including the Organization for Competitive Markets ("OCM"), thirteen states,[1] American Antitrust Institute ("AAI"), Center for Food Safety ("CFS"), state farmers unions, businesses and business groups, associations, and granges prior to the August 27, 2007 deadline for public comments.

Six months later, on March 5, 2008, DOJ filed its Response to Public Comments ("DOJ's Response") as required by the Tunney Act.

The Court must now determine whether the Consent Decree is "in the public interest."  In making this determination, the Court may authorize participation in proceedings on this issue by an interested party as *amicus curiae*. *See* 15 U.S.C. § 16(f).  OCM respectfully requests leave of the Court to submit a brief as *amicus curiae* in the above-captioned case.  This letter also serves as the Brief of *Amicus Curiae* Organization for Competitive Markets in Opposition to Motion for Entry of Final Judgment by United States of America.

---

[1] Virginia, Arkansas, Delaware, Kentucky, Maryland, New Mexico, North Carolina, Ohio, Oklahoma, Rhode Island, Tennessee, Utah, and West Virginia

P.O. Box 6486                                                                                                      662.476.5568
Lincoln, NE 68506                                                                                              www.competitivemarkets.com

**Interests of *Amicus Curiae***

OCM is an independent, nonpartisan, nonprofit group of farmers, ranchers, academics, attorneys, and policy makers, whose mission is to reclaim fair, open and competitive markets for producers of agricultural commodities in the United States. OCM's interest in this case is to ensure that the government fulfills its obligation to properly evaluate and consider the Tunney Act Comments to the Consent Decree and that Monsanto's acquisition of DPL does not harm competition to the detriment of American farmers and consumers.

**The Consent Decree's Proposed Remedies Are Inadequate And Should Not Be Approved By The Court**

As OCM stated in its August 7, 2007 comments, Monsanto's acquisition of DPL will cause substantial harm to competition in the transgenic cottonseed market.[2] DOJ acknowledged this fact in its Complaint,[3] but its proposed remedies to cure the anticompetitive effects of this acquisition are woefully inadequate. In particular, the proposed remedies fall short in the following six areas:

- Prior to Monsanto's acquisition of DPL, DPL partnered with Monsanto's competitors to develop alternative traits and insert them into finished seed. These partnerships posed a threat to Monsanto's monopoly position in cotton traits, where it possesses market shares of 95% and above, depending on the trait.[4] The acquisition, however, eliminates this threat by giving Monsanto the ability and incentive to foreclose competing cotton traits from entering the market by removing DPL as a trait development partner. With DPL's loss to competing trait developers, such developers now have little incentive to innovate and at least one trait developer exited the market as a result of this acquisition and the inadequate remedies agreed to by DOJ.[5] As a result, farmers will have fewer choices in cottonseed technology.

- In crafting the Consent Decree, DOJ was obligated to ensure that viable market alternatives to DPL exist, although DOJ is under no obligation to replicate DPL. However, the remedies proposed by the Consent Decree nonetheless fall short of creating a viable seed competitor to the new Monsanto/DPL monolith. The new "competitive" cottonseed company created by the Consent Decree is nothing more than a patchwork of unassociated assets consisting of certain Monsanto divestitures, including its Stoneville business unit, a cottonseed company Monsanto purchased in 2005, as well as certain cottonseed lines

---

[2] *See* Plaintiff United States's Response To Public Comments, Exhibit 9, Letter from Keith Mudd, President of OCM to Donna N. Kooperstein, August 7, 2007 ("OCM Tunney Act Comments").

[3] Complaint ¶ 9.

[4] *See, e.g.,* Complaint ¶ 3; Plaintiff United States's Response To Public Comments, Exhibit 1 at 14, Tunney Act Comments Of The American Antitrust Institute On The Proposed Final Judgment ("AAI Tunney Act Comments").

[5] OCM Tunney Act Comments; Plaintiff United States's Response To Public Comments, Exhibit 4 at 2, Comments Of DuPont On Proposed Final Judgment ("DuPont Tunney Act Comments").

owned by Monsanto itself that DOJ labeled "promising" and "developmental." In addition, DOJ required DPL to divest certain cottonseed and germplasm[6] lines to the purchaser of these cobbled-together assets, Bayer Cropsciences ("Bayer"), that were selected by DOJ after an examination of information chosen by Monsanto/DPL. DOJ calls this hodgepodge the Enhanced Stoneville Assets, but even with the "enhanced" portion of the assets, Bayer/Stoneville will be unable to compete in the cottonseed market against the now massive Monsanto/DPL combination. Indeed, the required divestitures did not even include the human capital necessary to turn the "promising" and "developmental" lines transferred into commercially viable products.[7]

- The "divestitures" required by the Consent Decree are, in reality, not divestitures at all. In particular, the enhanced aspect of the Stoneville Assets consist only of <u>non-exclusive</u> licenses to the Cotton States Germplasm and DPL's "divested" germplasm, as well as allowing for a license back to Monsanto/DPL of the Advanced Exotic Yield Lines. As a result, Monsanto retains rights to nearly all of the assets "sold" to Bayer.[8]

- Many of the lines of germplasm that DOJ required Monsanto and DPL to "divest" either are in development and not commercially viable or make up less than one percent of the cotton acres planted in the markets defined by the Consent Decree. The current viability of the "divested" germplasm is uncertain at best and, as DOJ acknowledges, it will take eight to fifteen years for Bayer/Stoneville to bring traits to market.[9] Therefore, these "divestitures" do nothing to alter Monsanto's monopoly in the near term, and offer only speculative alternatives in the long term.

- Even after the "divestitures," the acquisition of DPL gives Monsanto a 50% nationwide share of the cottonseed market and a much higher share of relevant cottonseed markets such as the Southeast and the MidSouth, where DPL, prior to the acquisition, respectively sold 87% and 79% of all traited cottonseed.[10] Therefore, it will be difficult for trait developers to get their traits from the lab to the fields because they will be foreclosed from a substantial segment of the market now that Monsanto/DPL commands half such market nationally. Recouping the enormous costs associated with research and development will be extremely difficult, and trait developers will be much less likely to innovate.

---

[6] Germplasm is the base genetic material for seeds.

[7] *See* Plaintiff United States's Response To Public Comments, Exhibit 11 at 7, Comments Of The Attorneys General Of Virginia, Arkansas, Delaware, Kentucky, Maryland, New Mexico, North Carolina, Ohio, Oklahoma, Rhode Island, Tennessee, Utah, And West Virginia On The Proposed Final Judgment In *United States v. Monsanto Company, et al.* ("States Tunney Act Comments").

[8] *See* AAI Tunney Act Comments at 9-11.

[9] *See* OCM Tunney Act Comments; AAI Tunney Act Comments at 11-14.

[10] Complaint ¶ 4.

- ♦ DOJ's attempt to restore competition to the traited cottonseed market by removing the restrictive licensing provisions of Monsanto's agreements with independent seed companies similarly falls short. The removal of such provisions does not make up for the loss of DPL as a partner to trait developers, and Bayer/Stoneville will have insufficient market share or know-how to give trait developers access to a significant enough portion of the market to create competition for Monsanto's traits.[11]

**DOJ's Response To The Tunney Act Comments Ignores Key Concerns**

DOJ's Response demonstrates a poor understanding of the traited cottonseed market and fails to ensure competition in that market. DOJ maintains that the post-acquisition traited cottonseed market is not substantially different from the pre-acquisition market because there were two choices for farmers pre-acquisition, Stoneville seed with Monsanto traits or DPL seed with non-Monsanto traits; and post-acquisition there are still two choices for farmers, Stoneville seed with Bayer traits and DPL seed with Monsanto traits. This is an oversimplification of the market because it does not take into account traits that, although not currently available, were being developed by DPL in conjunction with Monsanto competitors that soon would have been available.

But for the acquisition, "non-Monsanto" traits available in the market within a short period of time likely would have consisted of traits developed by Dow, Syngenta, Bayer, and DuPont/Pioneer, whereas DOJ concedes that now there will be only Bayer and Monsanto traits available to farmers for the foreseeable future. Even if Bayer chooses to collaborate with competing trait developers, Bayer/Stoneville's market share is so small and its development capabilities so lacking that the opportunities for partnering with it do not compare to the opportunities represented by an independent DPL. Further, as a direct consequence of this acquisition, at least one Monsanto competitor (DuPont, which had a joint venture with DPL) has already exited the cotton trait market by discontinuing development of a trait that would have been introduced to the market in relatively short order. DOJ's Response, rather than demonstrating that the Consent Decree is in "the public interest" has instead made it clear that the Consent Decree actually creates a duopoly in cotton traits, for the present and, likely, the future.

There also is little in DOJ's Response to assuage concerns that the germplasm selected for "divestiture" will allow Bayer/Stoneville to compete with Monsanto. For example, thirteen states, including three of the top six cotton growing states, voiced their apprehension that without a transfer of personnel from DPL to Bayer/Stoneville, Bayer/Stoneville is unlikely to be able to compete in the current market. DOJ ignored the states' legitimate concerns.

In addition, DOJ failed to address the concern held by many and expressed in AAI's Tunney Act Comments that Monsanto/DPL may have influenced which lines the government chose for "divestiture" by disclosing only certain information about DPL's germplasm stock. DOJ simply was not in a position to pick the most appropriate germplasm to include in the Enhanced Stoneville Assets based solely on Monsanto/DPL's representations.

---

[11] AAI Tunney Act Comments at 16-18.

Finally, DOJ summarily dismisses nearly every commenter's concern that Monsanto's acquisition of DPL and its resulting cottonseed monopoly will have harmful spillover effects on other American crops. Despite apparently not investigating this concern at all, DOJ claims that because the number of cotton acres is relatively small compared to corn and soy acres, losing a revenue opportunity in cotton will not prove a disincentive to trait developers. This "analysis," however, ignores the realities of trait development. Even if cotton represents an incremental revenue opportunity for trait developers, that revenue opportunity is significant considering the enormous expenditures involved in trait research and development. Moreover, working with traits in multiple crops simultaneously can result in significant technological advances that can translate into increased revenue.

### DOJ's Lengthy Delay In Filing Its Response Violated The Purpose Of The Tunney Act

When DOJ announced on May 31, 2007, that it would allow Monsanto to acquire DPL, opposition was strong. As noted earlier, thirteen states and numerous organizations filed comments opposing DOJ's Consent Decree. DOJ not only has ignored that opposition, it has virtually insulated the acquisition from court oversight by its greater than six-month delay in filing its required response to public comments, while at the same time allowing Monsanto to take control of DPL.

Since Congress passed the Tunney Act Amendments in 2004, DOJ responded to public comments within forty-three days of the comment deadline in eighty-nine percent of cases. In the remaining eleven percent, DOJ responded in ninety days. In *United States v. Microsoft*, No. 98-1232 (D.D.C.), for example, DOJ responded to over 30,000 comments, totaling hundreds of thousands of pages, within thirty days of the comment deadline. Here, DOJ required over six months to review and respond to thirteen comments totaling 125 pages.

DOJ noted in its response that it allowed the acquisition and divestitures to take place during the pendency of the Tunney Act proceedings in order to ensure that Monsanto and DPL did not remain in "competitive limbo because of court review."[12] However, the fundamental purpose of the Tunney Act is to provide for "court review," for which DOJ did not require Monsanto and DPL to wait. By allowing the acquisition to be consummated while delaying its review of and response to the Tunney Act comments, DOJ has frustrated meaningful review by this Court, circumventing Congress' mandate in enacting the Tunney Act. Furthermore, DOJ could have ameliorated any delay by acting promptly and responding to the Tunney Act comments. Monsanto and DPL are now so integrated that even if the Court were to overturn or require modifications to the Consent Decree, DOJ's inexcusable delay has compounded the burden on the Court.

In 2004, Congress amended the Tunney Act in order to ensure courts do not merely "rubber stamp" DOJ settlements. To that end, the statute now requires the Court to consider certain factors in making a public interest determination. *U.S. v. SBC Comm. Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007). In general, the Court must inquire into "how well the settlement remedies the harms alleged in the complaint[]." *Id.* at 17. However, the harm of the Monsanto/DPL transaction already has impacted the economy and DOJ's delay in responding to the Tunney Act comments has hindered and complicated the Court's ability to provide

---

[12] Plaintiff United States's Response To Public Comments at 13.

meaningful relief and take appropriate action before trait developers, farmers and consumers suffered the anticompetitive effects of the acquisition.

**Conclusion**

The Consent Decree in this case is not "in the public interest." Therefore, OCM respectfully requests that the Court refuse to enter the Proposed Final Judgment and require that DOJ modify the Consent Decree to adequately address the substantial competitive harm of Monsanto's acquisition of DPL.

Sincerely,

*[signature]*

Michael Stumo
General Counsel, OCM